Laramoee, Judge,
delivered the opinion of the court:
Plaintiffs ask for lost profits totaling $5,000,000 which is their alleged damage caused by the defendant’s failure to enter into a contract to purchase their uranium ore or concentrate.[1] They claim that the defendant’s greatly publicized *422 program to stimulate domestic uranium discovery and production constituted an offer which they accepted, or in the alternative, that they made an offer which the government accepted but refused to formalize. We hold that there was no contract, either unilateral or bilateral, and accordingly give judgment for the defendant.
The record in this case is voluminous. A thorough reading of the plaintiffs’ exceptions and briefs alone is enough to exhaust the heartiest. Regrettably, the parties have not helped us .by providing a summary of the facts and arguments. It is our particular good fortune to have an extremely thorough and ably presented “Findings of Fact” from our commissioner. We have made a number of minor changes in the findings to satisfy some of plaintiffs’ exceptions. None of the changes has any effect on the outcome, however.
The history of Atomic Energy Commission (AEC) policy regarding uranium procurement is important to plaintiffs’ legal theory. We note that one of the stated purposes of the Atomic Energy Act of 1946, 60 Stat. 755, as amended, 42 U.S.C. § 1801-1819 (1946 Ed.) was to assure the development of a domestic uranium industry which had been theretofore nonexistent. To this end, the AEC was granted very broad powers to purchase uranium source materials. 42 U.S.C. § 1805 (b) (5) (1946 Ed.). One of these powers was to establish “guaranteed prices for all source materials delivered to it within a specified time.” (Emphasis added.) In published regulations entitled “Domestic Uranium Program Circulars,” the AEC established minimum prices for certain categories of uranium ores and concentrates. Thus, on August 11,1948 in Circular No. 1, the AEC provided for a “ten year guaranteed minimum price” for high-grade uranium-bearing ores and mechanical concentrates delivered to the Commission in specified quantities. 10 C.F.R. §60.1 (1949 Ed.). On the same day, the AEC announced in Circular No. 5 a guaranteed minimum price for “uranium-bearing carnotite-type or roscoelite-type ores [low-grade ores] of the Colorado Plateau *423 area” delivered in certain quantities to the AEC depot at Monticello, Utah.[2] 10 C.F.B. §§60.5-, 60.5a (1958 Supp.). *424 The substance of Circular No. 5 was repeated on May 24,1956 when the AEG announced an extension of the procurement program.[3]
*425 In addition to encouraging discovery of uranium reserves by guaranteeing minimum prices, the AEC offered bonuses which operated primarily as an incentive for small producers. For example, Circular No. 2 provided for a $10,000 bonus to producers of ore or concentrates meeting certain conditions. 10 C.F.R. §60.2 (1949 Ed.). Circular No. 6 provided for another bonus computed on a sliding scale to accord with the grade of ore. 10 C.F.R. § 60.6' (1958 Supp.). AEC officials made many statements of varying degrees of formality about the purposes of the domestic uranium program and its implementation. Industry officials, and even the general public to a lesser degree, were naturally very aware of the government’s intention to encourage prospecting on a broad scale. The testimony and exhibits are replete with speeches, convention and congressional hearing transcripts, press releases and the like, showing that prior to *426 1957 the government was conducting a very aggressive uranium development program. It is no exaggeration to say that in this.period of uranium “fever,” when speculation in uranium shares was rampant and even children could purchase “junior” Geiger counters, it was widely assumed that the government stood ready to buy all the uranium anyone could find. It was in this atmosphere that the plaintiffs began their exploration activities in the summer of 1955.
For narrative purposes, we are primarily interested in the activities of Northwest Uranium Mines, Inc. (Northwest) which is represented here by its trustee in liquidation.[4] Northwest became an active corporation in May of 1955 when its shareholders contributed about $100,000' operating capital. This really understates the capitalization because the principal shareholders were other mining companies and individuals engaged in the mining business who stood ready to contribute more capital and free services, the latter being particularly important to a prospecting venture. With its capital, Northwest purchased a small airplane and retained, a pilot to conduct an airborne reconnaissance program in an area near Spokane, Washington. With a scintillometer, Northwest personnel detected a number of radiation “anomalies” indicating the existence of uranium-bearing ores* Follow-up ground examination proved that only one of the anomalies had potential for development. This was located on the Spokane Indian Reservation near the Midnight Mine, owned by the Dawn Mining Company.
In October 1955, Northwest procured prospecting permits, by assignment from two Spokane Indians, and immediately used a bulldozer to strip overburden to expose the uranium-bearing rock formations for examination. In addition, Northwest was able to drill for samples before the December snows. About this time, Northwest’s vice president and general manager visited the Defense Minerals Exploration Administration (DMEA) office at Spokane to discuss the possibility of an exploration loan. Here begins the story of Northwest’s dealings with defendant.
During late 1955, it was Northwest’s intention to develop its property and sell the ore in such a way that it could pre *427 serve its depletion allowance for Federal income tax purposes. To this end, it sent a letter on December 10, 1955 to the manager of the AEC’s office at Grand Junction, Colorado. This was the office charged with administering AEC uranium procurement. The substance of this letter was that Northwest was interested in a contract providing that the AEC purchase concentrate from Northwest ore treated by a mining company on a toll basis. The letter posed the following question:
Oan vie enter into negotiations with the Atomic Energy Commission to sell to you a concentrate from our ore that is treated by some other mill on a toll basis. Another phase of this question might be, can we enter into a eontraet whereby we have our ore treated on a toll basis then sell the concentrate to the milling firm. [Emphasis added.]
The AEC replied on December 14 that depletion was an Internal. Revenue matter, outside AEC jurisdiction. Regarding a contract to purchase uranium concentrate, the letter responded to Northwest’s inquiries as follows:
If you are interested in the possibility of constructing a mill to process ores produced in the Spokane area, the procedure followed by the Commission is to consider detailed proposals submitted by private companies for the construction and operation of a plant and the sale to the Commission of uranium concentrates produced. Concentrates meeting required specifications are purchased by the Commission at unit prices under the terms of negotiated contracts.
The letter emphasized that particular attention should be focused on developing an adequate ore supply to assure economic operation of the mill throughout its useful life. Northwest did not reply to this letter, nor did it engage in any substantial negotiations with the AEC until July 1957. During this hiatus, Northwest was engaged in a drilling and assaying program to establish its ore reserves.
Financing for exploratory operations was arranged with the DMEA on June 15,1956 in an exploration contract providing for a $29,160 loan. By November 1956, the drilling program was substantially completed, and in January 1957, the AEC Spokane office engineer estimated Northwest’s *428 uranium ore deposits on a .06 percent “cutoff” (ores below cutoff cannot be economically processed) at 616,009.75 tons of ore averaging .116 percent U308 (uranium oxide). This was somewhat lower than Northwest’s estimates, allegedly based on more drillings and showing 683,660.48 tons of ore containing 1,578,244.33 pounds of U3Os.
With reserves satisfactorily established by late 1956, Northwest again began to consider the most desirable way to sell its ore. Its first thought was to investigate the possibility of constructing facilities to chemically upgrade the ore to a concentrate which could be processed in an existing mill for ultimate sale to the AEC. Northwest was encouraged to pursue this route because in August 1956 the AEC and Dawn Mining contracted for the construction and operation by Dawn of a new processing mill. This contract contained the usual provision that Dawn must make available 25 percent of the mill’s total capacity (400 tons of uranium-bearing ore per day) to “custom” ores of independent producers. The Northwest ores, if upgraded, would qualify. Thus, in August or September of 1956, Northwest consulted the designer of the Dawn mill to determine the feasibility of an upgrading scheme. He determined that the ore could be mixed with chemicals to produce a wet solution which, after a drying process, would yield a slurry containing 8 percent U808. This slurry could be put through the circuits of a custom mill to produce a concentrate containing 70 percent Us08. Armed with this information, Northwest arranged a conference on January 3, 1957 with the AEC Grand Junction manager. Northwest knew the AEC was not interested in buying the slurry. The purpose of the conference was to explore the possibility of selling the slurry to existing mills holding concentrate contracts with the AEC. The Grand Junction manager reiterated AEC policy, and counseled Northwest to negotiate the matter with the mills.
Northwest thereafter contacted the Vitro Uranium Company, a custom producer in Salt Lake City, Utah, in addition to Dawn. After extensive research on mill facilities and transportation difficulties, both Dawn and Vitro informed Northwest that they could not pay prices acceptable to Northwest for ore or slurry. Vitro said it might be interested if *429 the ABC would amend the provisions of an existing concentrate contract; Dawn indicated that it would have to alter its facilities, which would likewise necessitate amending an existing AEC contract. In a letter on July 13,1957, Northwest explained these difficulties to the AEC Grand Junction manager. It proposed a contract for the installation of a uranium concentrator plant to produce the 8 percent slurry which would be processed further. Because Dawn and Vitro could not process the slurry on an economic basis, Northwest suggested that any contract pi’ovide, in addition, for Northwest’s installation of a continuous ion exchange unit (which could produce a 70 percent UsOs product acceptable for AEC use without further processing) or an ammonia precipitating process (which would produce a 15 percent 11308 product acceptable for AEC use if blended with other concentrates). Northwest readily acknowledged that its proposal was unusual:
The contemplated concentrator does not follow the usual uranium plant design in that we will produce a low grade concentrate assaying approximately 8% U3Os from ore assaying 0.124% U303, and it is anticipated that the product will be processed further in an existing mill.
It also made it clear that it contemplated a relatively short use period for the concentrator plant:
This one reserve [about 600,000 tons] allows for at least a four year operation at this daily tonnage rate [400 tons].
And it specified as an additional provision that it intended to process onkj captive ore: “the flow sheet as developed will not accommodate custom ore.”
Between July 13 and October 9, 1957, Northwest’s vice president and general manager doggedly pursued AEC procurement officials. In a series of phone calls and visits, the AEC officials put Northwest off with statements to the effect that they had not been able to review the July 13 proposal. They told Northwest that the reason for their hesitancy was that they were reviewing the AEC’s procurement policy in the light of the increased supply of proven uranium ore reserves. By late 1956, total uranium reserves had risen to *430 more than. 60,000,000 tons primarily due to the discovery of about 30,000,000 tons in the Ambrosia Lake area near Grants, New Mexico. The AEC Grand Junction manager did say, -however, that the proposed price for the Northwest ore was one of the most reasonable he had seen, and he suggested that he would review a detailed proposal for a uranium concentrator and mill that included a cost analysis. This Northwest submitted on October 9,1957.
Although the detailed proposal was quite comprehensive, the AEC could not have “formalized” it into a contract without extensive investigation by its experts and negotiations between Northwest and AEC officials. The proposal never received this kind of consideration, however, because the Commission was then reviewing its requirements for future purchases of uranium concentrates. Northwest was informed to this effect on October 22, 1957. Less than a week later, on October 28, 1957, the AEC Director of Law Materials announced in a speech that the Commission would thereafter follow a new procurement policy. Relevant to Northwest’s ambitions was the following language :
* * * we have arrived at the point where it no longer is in the interest of the Government to expand production of uranium concentrate. It has been apparent for some time that this point was being approached. * * * Since the beginning of this year, the possibilities of additional major increases in domestic uranium production have become apparent.
* * # * *
Under these circumstances the Commission, at this time, is faced with limiting commitments for additional domestic uranium production. Proposals for domestic contracts which already have been submitted and are under review still will be considered in the light of the discussions which have taken place. In some instances these discussions were initiated a year or more ago.
It is reasonable to assume that it was because of this announced policy change that no further consideration was given to Northwest’s proposal nor was Northwest invited to negotiate. It is also reasonable to assume that the AEC felt that the previous discussions with Northwest were too tentative to warrant further consideration “in the light of the discussions which have taken place.” After October 28, the *431 Commission in fact rescinded the authority of its procurement officials to negotiate any new contracts which had not been approved in substance before the announced policy change.
Plaintiffs urge that these facts make out a good cause of action for the recovery of the profits they would have made had the defendant purchased their uranium product. Their first argument is that an “implied in fact” contract came into .being by their acceptance of the AEC’s continuing offer to purchase “all economically and metallurgically amenable uranium ores irrespective of the type of ore involved or its geographical location.” They find an offer in the whole AEC procurement program. More particularly, plaintiffs look at Circular No. 5 and the May 24, 1956 announcement, and add to them administrative practice, public addresses, press releases, and customs. The total of all these ingredients constitutes the extremely broad “continuing offer.” This, they assert they accepted by means of specific contract proposals first on July 13, 1957, and again on October 9, 1957, upon their “tender” of the Northwest ore body to the Commission. Their theory, of course, dates acceptance before AEC revocation, which they contend took place on October 28,1957; alternatively, they say that the offer was never revoked as to them because the October 28 announcement provided that “proposals for domestic contracts which have already been submitted and are under review still will be considered in the light of discussions which have taken place.”
Addressing ourselves to the problem of “offer,” we are not persuaded that all of the ingredients plaintiffs add together to make up a “continuing offer” can constitute an offer. It seems to us that plaintiffs are attempting to make the whole equal to a good measure more than the sum of its parts. Although we fully recognize that prior to October 28, 1957 the AEC appeared to be eager to stimulate uranium discovery and production, and published guaranteed minimum prices to that end, we do not think that there was any offer to purchase all economically and metallurgically amenable uranium ores irrespective of the type of ore involved or its geographical location.
*432 In Radium Mines, Inc. v. United States, 139 Ct. Cl. 144, 153 F. Supp. 403 (1957), we considered the applicability of Circular No. 1 to a more limited claim. There, we said that Radium Mines, Inc. had no contract with the government because the AEC reasonably determined that the uranium was not recoverable, as was its right under the express terms of Circular No. 1. We answered the government’s argument that Circular No. 1 was not an offer by saying:
It could surely not be urged that one who had complied in every respect with the terms of the Circular could have been told by the Government that it would pay only half the “Guaranteed Minimum Price,” nor could he be told that the Government would not purchase his uranium at all. [139 Ct. Cl. 144, 148, 153 F. Supp. 403, 406.]
The position of the plaintiffs here is “shakier” than Radium Mines, Inc. They concede, of course, that “technically” the Circular No. 5 “offer” could not comprehend their ores as it expressly applies only to “carnotite-type or roscoelite-type ores of the Colorado Plateau area” delivered to the AEC buying depot at Monticello, Utah. Nor could Circular No. 1 comprehend their concentrate, as it applies only to high grade ores and concentrates. So they are forced to broaden any “offer” that might be contained in the circulars, and they do this by directing us to the policy statements, notably the May 24,1956 announcement, and the alleged procurement practices of the Commission. We do not need to state precisely what the AEC’s offer might have been. It is enough to say that it was not sufficiently broad to have ripened into the contract plaintiffs assert here.
Even if we were to accept plaintiffs’ theory of continuing offer, we do not think plaintiffs have shown that they either did accept or could have accepted it simply by submitting proposals. For the bilateral, “implied in fact” contract plaintiffs seek to establish, we look for facts which permit us to infer a “return promise * * * [from] a document, an act, or a course of conduct.” The Padbloc Co., Inc. v. United States, 161 Ct. Cl. 369, 377-78 (1963). The decision in Radium Mimes (although focusing on unilateral contract *433 theory) can be read as saying that such a contract comes into being when the producer accepts the government’s offer by “putting itself in a position to supply the ore described in the circular.” Himfar v. United States, ante, p. 215. In our recent per curiam decision in Himfar, we chose this approach, and held that a regulation relating to the purchase of manganese ore at guaranteed minimum prices induced such “significant action” by the plaintiff to find and mine ore that the government was obligated to receive and pay for ore meeting the requirements of the regulation. We said that “the consideration for this obligation was the plaintiff’s finding of manganese and his efforts to produce it.” Ante, p. 215.
Although this theory might at first appear to give plaintiffs heart, we feel that they fail both the tests of “significant action” and “meeting the requirements of the regulation.” In Himfar, the plaintiff had received the required certificate of authorization and had made substantial deliveries of ore. It was the government’s refusal to accept and unload a delivery, as well as its refusal to accept future shipments, that precipitated the lawsuit. By contrast, plaintiffs here have made no deliveries. In fact, at the time Northwest submitted the specific proposals it had never mined ore. There were, of course, good reasons for Northwest to hold back on further development until a contract could be finalized. We appreciate that the AEC was the sole market for uranium and that no reasonable businessman would proceed beyond the development stage until he could be sure he could sell the product to the AEC on a profitable basis. It would simply have been impossible for Northwest to have done much more than it did; but what it did was not enough, and we say this with full knowledge that Northwest no doubt reasonably relied on the AEC’s general policy of buying almost all available uranium products.
In holding that plaintiffs have not accepted the offer they assert here, we look to the problem of price, the low grade of the ore and the complexity of the proposal for upgrading it in the concentrator plant, the short life period of the stated reserves when compared with the usual amortization period for uranium processing mills, and the fact that North *434 west proposed to process only its ores contrary to general AEC policy which, was to.make some plant capacity available to custom producers. Surely many of these problems could have been ironed out in negotiations between plaintiffs and the AEC, and a contract could have been “formalized.” This is not the kind of contract a court should feel constrained to write, however. This is precisely the kind of contract that the AEC intended to leave to negotiation, and Circulars No. 1 and No.! 5, as well as the announcement of May 24, 1956 and the statements by AEC officials to Northwest, gave ample notice of this intention.
Probably the plaintiffs’ best argument is that the government is estopped to deny the existence of a contract because .of plaintiffs’ reliance. This is really the promissory estop-pel theory we alluded to in Radium Mines. Much of what we have said above answers this argument, but in the interest of clarity, we dispose of this contention separately. The Restatement of Contracts binds the promisor “if injustice can be avoided only by enforcement of the promise” when the promisor makes, a promise which he “should reasonably expect to induce action * * * on the part of the prom-isee * * * and which does induce such action.” Restatement, Contracts § 90, Tent. Draft No. 2 (April 30, 1965). We do not resort to section 90 lightly; it is not an .automatic rule. “Injustice” is the ultimate test, and this leaves us great flexibility. In determining whether this test is met, we shall be guided by the following factors:
Satisfaction of the latter requirement [enforcement must be necessary to avoid injustice] may depend on the reasonableness of the promisee’s reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant. [Restatement, Contracts § 90, Comment b., Tent. Draft No. 2, p. 166 (April 30,1965).]
When we apply these criteria to Northwest’s activities and dealings with the AEC, we find that plaintiffs fall far short of the mark.
*435 Looking first at tbe “promise,” wbicb is tbe alleged “continuing offer” discussed earlier, we are not persuaded tbat tbe AEC should have expected that it would be bound to a contract by action like that performed by Northwest. We think that the AEC could have reasonably anticipated that it would be bound only by more substantial performance in accordance with the precise terms of its circulars, or, of course, by a negotiated contract. We do not feel that justice requires us to charge the defendant with plaintiffs’ hoped for profits where the reliance consisted of exploration and the preparation of an integrated plan for the mining and processing of ore. Regarding the “formality with which the promise is made,” we note that plaintiffs had ample notice that negotiated contracts were the rule for situations deviating from the relatively limited provisions of the circulars. There was no formal promise to buy all uranium regardless of mining and processing difficulties, and any informal promise was not sufficiently broad to comprehend plaintiffs’ reliance. Finally, as a matter of policy, we do not think this is the proper case for us to “avoid injustice” by enforcement of a “promise.” As we mentioned earlier in discussing plaintiffs’ acceptance argument, the contract plaintiffs assert involves exceedingly complex, technical issues that could be resolved only by extensive study and negotiations. The interests of “the commercial setting” would not be well-served by our finding that a contract existed here.
Similarly, the plaintiffs do not have a claim for partial enforcement.[5] They have not established that they did anything more than many other parties who unsuccessfully “bid” for a contract with the government. For partial enforcement by promissory estoppel, we would look for something more. Like the first year law student confronted with the problem of determining at what point there is an enforce *436 able contract where someone promises $5 to any person who crosses the Brooklyn Bridge,[6] we would at least require the promisee to get to the bridge. In the present action, plaintiffs did not reach that point.
In summary, we hold that defendant neither made the offer plaintiffs allege nor did plaintiffs accept any offer, and plaintiffs did not make an offer which the defendant accepted. Plaintiffs understandably hoped that a contract would be consummated, but the defendant’s change in procurement policy was reasonable and within the business risk which plaintiffs assumed as uranium speculators. Granting that the change in policy on October 28, 1967 was to be prospective only and all prior proposals were to be viewed ■“in the light of the discussions which have taken place,” we feel that the parties were at no time close to a contract and that the AEG was accordingly reasonable in discontinuing negotiations after the policy change.
The petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Upon the pretrial stipulation of the parties, approved by the trial commissioner, the trial of this case was limited to the issues of law and fact relating to the right of the plaintiffs to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
2. During World War II, defendant’s Manhattan Project developed the atomic bomb and created an urgent military requirement for the uranium necessary for such atomic weapons. Known sources of uranium were primarily the rich pitchblende-type ore deposits in two mines, one in the Belgian Congo, and the other in northern Canada. Low-grade uranium ores were known to exist in limited quantities in the western United States on the Colorado Plateau. These were carnotite-type and roscoelite-type ores, mined and milled for recovery of vanadium therefrom, with the uranium *437 remaining in the discarded mill tailings. No other domestic source of uranium was known. The Manhattan Project relied mainly upon production by the Belgian Congo mine as its source of uranium, but also drew upon the tailings of the Colorado Plateau vanadium mills.
After the end of hostilities in World War II, four of the five vanadium mills on the Colorado Plateau closed. Production of vanadium was minimal, and recovery of uranium as a byproduct of the milling of the vanadium ores had ceased.
3. A domestic uranium industry was practically nonexistent when the Atomic Energy Commission was created pursuant to the Atomic Energy Act of 1946, approved August 1, 1946, 60 Stat. 755, to supervise and direct programs and activities relating to fissionable materials and their military and civilian applications. The act contained a declaration of policy of
* * * the people of the United States, that, subject at all times to the paramount objective of assuring the common defense and security, the development and utilization of atomic energy shall, so far as practicable, be directed toward improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace.
The Atomic Energy Act of 1954, approved August 30,1954, 68 Stat. 919, contained a similar declaration of policy, stating that atomic energy was capable of application for peaceful as well as military purposes, with the paramount objective being maximum contribution to the common defense and security.
4. The enabling legislation authorized the AEC to procure source material, defined as uranium, thorium, or any other material determined to be peculiarly essential to the production of fissionable materials, the latter term being-defined as plutonium, uranium enriched in the isotope 235, or any other material determined to be capable of releasing substantial quantities of energy through nuclear chain reaction.
With respect to acquisition of source materials, the 1946 act provides as follows:
*438 (5) ACQUISITION. — The Commission is authorized and directed to. purchase, take, requisition, condemn, or otherwise acquire, supplies of source materials or any interest in real property containing deposits of soúrce materials to the extent it deems necessary to effectuate the provisions of this Act.' Any purchase made under this paragraph may be made without regard to the provisions of section 3709 of the Bevised Statutes (U.S.C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and partial and advance payments may be made thereunder. The Commission may establish guaranteed prices for all source materials delivered to it within a specified time. Just compensation shall be made for any property taken, requisitioned, or condemned under this paragraph. [42 U.S.C. § 1805(b) (5) (1946 Ed.)]
The 1954 act contains substantially the same provisions.
5. Neither the enabling legislation nor any AEC regulations prescribe formalities as to the terms or type of contract necessary to establish valid and enforceable obligations in the conduct of the atomic energy program.
6. The two major categories of uranium source material which the AEC has procured, both from domestic and foreign suppliers, consist of “ores” of various types (or mechanical concentrations of such ores) and “concentrates.” Uranium concentrate, also commonly referred to as “yellow cake,” is a granular substance, resulting from the milling or processing of uranium-bearing ores or other uraniferous materials such as mill tailings, which varies in color, appearance, and precise chemical composition, depending upon the materials from which it is derived and the treatment processes which have been employed. Its principal constituent is uranium oxide, U308, precipitated from the treated material by one of a variety of metallurgical processes. The high-grade concentrate- or precipitate is the final product falling within the “source material” category and hence the ultimate object of all raw material procurement activities.
7. Uranium is found in a number of different minerals, such ■as uraninite, torbernite, autunite, uranophane, schroec-kingerite, and carnotite, and the ore containing such mineral is named for that predominant or significant mineral, even *439 though several other minerals are generally contained in such ore. The various types of uranium-bearing ores differ, substantially in their composition and in the metallurgical treatment processes required for the successful recovery of theU308 content.
8. Throughout the period of time pertinent to this case, the administration of the AEC’s source materials program, both foreign and domestic, has been under the direction and responsibility of the Division of Eaw Materials in Washington, D.C. The Director of the Division of Eaw Materials at all times since January 1, 1950, has been Mr. Jesse C. Johnson, who had served for the 2 years immediately preceding that date as Deputy Director. In turn, the Grand Junction Operations Office, Grand Junction, Colorado (hereinafter called Grand Junction), was charged with the administration of domestic raw material procurement in all areas west of the Mississippi Eiver. At the times most pertinent to this case, Mr. Allan E. Jones has served as manager of Grand Junction.
9. Following the breakdown of the 1948-1947 efforts in the United Nations to create a system of control of nuclear weapons, the United States by reason of defense policy had an urgent military requirement for uranium. The AEC early directed its efforts to reduce excessive dependence of the United States on the Belgian Congo source of supply through stimulation of discovery, exploration, development, and mining by private industry of domestic reserves of uranium-bearing ores.
At the inception of the domestic uranium program, the United States conducted extensive exploration for uranium ores, discovering about one million tons of such ore reserves, whereas private industry thereafter discovered about eighty million tons.
10. In 1947 the AEC acquired a surplus vanadium mill located near Monticello, Utah, on the Colorado Plateau, and undertook to adapt it to the recovery of uranium from the carnotite-type and roscoelite-type ores of the surrounding area, principally the Uravan Mineral Belt in Colorado. In succeeding years, the Monticello mill was the only processing or milling facility under the ownership and operation of the • *440 AEC, and it served a number of functions other than to refine and supply concentrate for the atomic energy program, including assistance in the practical application of new processing techniques under study and development of the AEC research facilities in Winchester, Massachusetts, and Grand Junction, Colorado, and also assistance in the accumulation of processing cost data useful in the negotiation of concentrate contracts with private milling concerns.
11. Beginning in 1948, the AEC formulated its program for development of domestic sources of uranium, and its announced policy was to stimulate private industry to engage in widespread prospecting, exploration and development of uranium ore reserves, and, since the United States was to be the sole purchaser of uranium, to give adequate guarantees as' to the price and period of purchase in order that private industry could finance and operate uranium mines and mills.
In repeated public announcements, the AEC made plain its policy to limit its direct purchase of uranium ores, and to have uranium mills privately owned and operated, with raw material procurement by the AEC to be principally in the form of uranium concentrates sold by the mills to the AEC under negotiated written contracts.
12. Beginning in 1948, and for all pertinent years thereafter, a number of measures were undertaken by the AEC as a means of lending assistance and encouragment to private industry in the development of the uranium industry.. Among these were the setting up of field offices to assist people searching for uranium deposits; the publication and dissemination of literature on uranium prospecting; the distribution of radiation anomaly maps derived from airborne surveys with scintillometers of vast areas of the west, conducted by the AEC; the display of ore samples; response to specific inquiries relating to geological or mining matters; assays of ore samples without charge; metallurgical testing of uranium ores to determine amenability to processing conduct of drilling operations and the calculation of ore reserves on specific properties; the building of access roads; in remote areas to facilitate the removal of ore to markets; construction of a pilot plant at Grand Junction, Colorado, to develop improved processes for treatment of uranium- *441 bearing ores; establishment of ore-buying stations at widespread places in the western United States; and issuance of numerous press releases on developments in the expanding uranium industry.
13. The AEC considered and rejected early in the formulation of its domestic uranium program the establishment of a uniform price at which it would purchase uranium concentrate from the mills. It could not arrive at a uniform price because it was impossible to forecast operating costs and depreciation schedules for different milling operations.
Consequently, the AEC determined and announced publicly that all uranium concentrate purchases would involve individually negotiated contracts for the construction and operation of privately owned mills, with the contracts providing for purchase of the mill concentrates, the price to be arrived at by taking into account the ore cost and the estimated milling cost, including plant amortization and profit.
14. Commencing on April 11,1948, the AEC issued a series of Domestic Uranium Program Circulars, all of which were duly published in the Federal Register.
15. Domestic Uranium Circular No. 1, hereinafter called Circular 1, went into effect on April 11, 1948, and expired, on April 10, 1958. Circular 1 provides as follows:
§ 60.1 Ten year guaranteed minwvwm price — (a) Guarantee. To stimulate domestic production of uranium and in the interest of the common defense and security the United States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in paragraph (b) of this section, for the delivery-to the Commisssion, in accordance with the terms of this section during the ten calendar years following its effective date, of domestic refined uranium, high-grade uranium-bearing ores and mechanical concentrates, in not less than the quantity and grade specified in paragraph (e) of this section. This guarantee does not apply to uranium-bearing ores of the Colorado Plateau-area, commonly known as carnotite-type or roscoelite-type ores, prices for which are established by § 60.3.
Note : The term “domestic” in this section, referring to uranium, uranium-bearing ores and mechanical concentrates, means such uranium, ores, and concentrates: *442 produced'from deposits within the United States, its territories, possessions and the Canal Zone.
(b) Guaranteed minvmum prices. The following minimum prices are established:
(1) For uranium-bearing ores and mechanical concentrates, $8.50 per pound of U308 (uranium oxide) determined by the Commission to be recoverable, less cost per pound of refining such ores or concentrates to standards of purity required for the Commission’s operations, to be determined by the Commission after assay of a representative sample.
(2) For refined uranium products, $3.50 per pound contained U808 (uranium oxide).
Prices are f.o.b. railroad cars or trucks at shipping point designated by the Commission convenient to mine, mill, or refinery. Weights are avoirdupois dry weight.
(c) Making an offer. Anyone who has domestic refined uranium, high-grade uranium-bearing ores, or mechanical concentrates of the quantity and grade specified in paragraph (e) of this section, may offer it for delivery to the Commission by sending a letter or telegram addressed as follows :
United States Atomic Energy Commission,
Post Office Box 30, Ansonia Station,
New York 23, N.Y.
Attention: Division of Raw Materials.
With each offer there should be furnished a representative ten-pound sample and the following information :
11) Location of property;
(2) Character of material offered for delivery (state whether refined uranium, mechanical concentrates, or uranium-bearing ores, indicating approximate composition) ;
(3) Amount of material offered;
(4) Location of material offered;
(5) Origin of material if offered by other than producer;
(6) If material is owned, in whole or in part, by any person other than the person making the offer, the name of each person having such ownership and nature of his rights; and
(7) Name and address of person making the offer.
Note : The reporting requirements hereof have been approved by the Bureau of the Budget pursuant to the Federal Reports Act of 1942.
(d) Purchase contract. Upon receipt of an offer and sample, an analylsis of the sample will be made.. If the *443 sample and the information furnished are determined by the Commission to meet the conditions of this section, the Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance. Prices will be not less than the applicable prices of paragraph (b) of this section.
(e) Minimum quantity and grade. No delivery will be accepted under this section of less than ten short tons (2,000 pounds per ton) of ores or mechanical concentrates, nor of ore or mechanical concentrates which assay less than 10 per cent U3Os by weight. No delivery will be accepted under this section of less than one short ton of refined uranium, nor of refined uranium which contains by weight less than 97 per cent Us08 in black uranium oxide or 87 per cent U3Os in sodium uranate. However, the Commission will be interested in negotiating reasonable terms with respect to deliveries of high-grade ores and refined products in lesser quantities and grades than those specified in this section.
(f) Large quantities or special conditions. The prices established in paragraph (b) of this section are minimum prices. The Commission may by negotiations establish higher prices for guaranteed delivery of lots of ores or mechanical concentrates substantially in excess of ten short tons, or for lots of refined uranium substantially in excess of one short ton. The Commission also may by negotiation establish higher prices for delivery of ores, mechanical concentrates or refined uranium under other special conditions, taking into consideration such factors as refining and milling costs, transportation costs, and other applicable factors.
(g) Other valuable minerals. In making payment for material delivered to it in accordance with this section, the Commission will give consideration to the existence of recoverable gold, silver, radium, thorium, or any other valuable constituent in the light of the cost of recovery.
(h) Licenses. Arrangements will be made by the Commission for the issuance of licenses, pursuant to the Atomic Energy Act of 1946, covering deliveries of source material to the Commission under this section. (Sec. 5(b), 60 Stat. 761.)
16. Domestic Uranium Circular No. 5, published simultaneously with Circular 1 in the Federal Register, was effective through June 30, 1954, but was later reissued and published in the Federal Register on March 12, 1951, as *444 Domestic Uranium Circular No. 5, Revised, effective through March 31,1962, and is referred to in these findings either as Circular 5 or Circular 5, Revised.
Circular 5, Revised, provides as follows:
§ 60.5 Guaranteed minimum 'price for uranium-bearing camotite-type or roscoelite-type ores of the Colorado Plateau area — (a) Guarantee. To stimulate domestic production of uranium-bearing ores of the Colorado. Plateau area, commonly known as carnotite-type or roscoelite-type ores, and in the interest of the common defense and security, the United States Atomic-Energy Commission hereby establishes the guaranteed -minimum prices specified in § 60.5a effective during the-period March 1, 1951, through March 31, 1962, for the-delivery of such ores to the Commission at Monticello,. Utah, in accordance with the terms of this section and. § 60.5a.
NOTE: In §§ 60.1 and 60.2 (Domestic Uranium Program, Circulars No. 1 and 2), the Commission established guaranteed prices for other domestic uranium-bearing ores, mechanical concentrates, and refined, uranium products.
(b) Eyed on §§ 60.3 and 60.3a.- Sections 60.3 and 60.3a, which also apply to camotite and roscoelite ores,, are not revoked by the issuance of this section and § 60.5a and sellers may elect to deliver ore under the provisions, of §§ 60.3 and 60.3a rather than under this section and. 60.5a, at their option, during the unexpired terms of' §§ 60.3 and 60.3a (through April 11, 1951). It is-believed, however, that in most cases the provisions-of this section and § 60.5a will be more favorable to-producers.
(c) Definitions. As used in this section and in- § 60.5a, the term “buyer” refers to the U.S. Atomic-Energy Commission, or its authorized purchasing agent. The term “ore” does not include mill tailings or other-mill products. Tie term “seller” refers to any person offering uranium ores for delivery to the Commission. Weights are avoirdupois dry weights, unless otherwise-specifically provided.
(d) Deliveries of not to exceed 1,600 tons per year.. To aid small producers, any one seller may deliver without a written contract but otherwise in accordance with this circular up to, but not exceeding, 1,000 short tons-. (2,000 pounds per ton) of ores during any calendar-year.
*445 (e) Deliveries in excess of 1,000 tons per year. ' Sellers desiring to deliver in excess of 1,000 sbort- tons (2,000 pounds per ton) of ores during any calendar year will be required to enter into a contract with the •Commission providing for, among other things, a rate •of delivery and the total quantity of ore to be delivered.
(f) Delivery. Seller, at his. own expense, shall deliver and unload all ores at the buyer’s depot at Monti•cello, Utah. Deliveries shall be in lots of not less than 10 short tons (2,000 pounds per ton) unless special ar-:rangeménts have been agreed upon by buyer,'but such lots may be delivered in more than one load. Days and hours during which ore may be delivered will be posted at the depot.
(g) Weighing, sampling, and assaying. Buyer will bear the cost of weighing, sampling, and assaying. The net weight of each load will be determined by the buyer’s weighmaster on scales which will be provided by the buyer at or in the vicinity of the purchase depot and such weight will be accepted as final. A weight ticket will be furnished seller or his representative for' each load. Each lot of ores will be sampled promptly by the buyer according to standard practice and such sampling will be accepted as final. Seller or his representative may be present at the sampling at his own expense. The absence of seller or his representative shall be deemed a waiver of this right. Buyer will make moisture determinations according to standard practices in ore sampling. All final samples will be divided into four pulps and distributed as follows: (1) The seller, or his representative will receive one pulp; (2) the buyer will retain one pulp; (3) the other two pulps will be reserved for possible umpire analysis. The buyer’s pulp will be assayed by the buyer. The seller may, if he desires, and at his own expense, have his pulp assayed by an independent assayer. In case of disagreement on assays as to any constituent of the ores, an umpire shall be selected in rotation from a list of umpires approved by the buyer whose assays shall be final if within the limits of the assays of the two parties; if not, the assay which is nearer to that of the umpire shall prevail. The party whose assay is the farther from that of the umpire shall pay the cost of the umpire’s assay for the constituent of the ores which is in dispute. In the event that the umpire’s assay is equally distant from the assay of each party, costs will be split equally. In case of seller’s failure to make or submit assays, buyer’s assays shall govern. After sampling, the ores may be *446 placed in process, commingled, or otherwise disposed of by buyer.
(b) Payment. Buyer will make payment promptly but payment will not be made until an entire minimum lot of ten short tons (2,000 pounds per ton) has been delivered and accepted, unless special arrangements have been agreed upon by buyer, in which case there may be an extra charge for assaying and sampling. Moisture determinations, analyses and settlement sheets, together with the check in payment, will be mailed to seller.
(i) Inquiries. All inquiries concerning the provisions of this section and § 60.5a, offers to deliver ores, or questions about the Commission’s domestic uranium program in the Colorado Plateau area should be addressed to: ‘
United States Atomic Energy Commission, Post Office Box 270, Grand Junction, Colorado; Telephone: Grand Junction 3000. .
(j) Licenses. Arrangements will be made by the Commission for the issuance of licenses, pursuant to the Atomic Energy Act of 1946, covering deliveries of source material to the Commission under this section and § 60.5a.
(k) Limitation of commitment. Commitments by the Commission to accept delivery of ores are limited to the provisions of this section and § 60.5a as amended from time to time, or to written contracts between the Commission and sellers. Other commitments purporting to be made by the Commission’s field personnel or other agents of the Commission will not bind the Commission unless they are in accord with the provisions of this section and § 60.5a or other official circulars.
§ 60.5a. Schedule I; minimum prices, specifications, and conditions — (a) Prices. Payment for delivery of the ores will be computed on the following basis:
(l) TJranium. (i) Ores assaying less than 0.10 percent: no payment. Any such ores which are delivered to the purchase depot shall, unless otherwise specifically agreed to by buyer, become the property of the buyer as liquidated damages for buyer’s expense of weighing, sampling, and assaying, and after sampling may be placed in process, commingled, or otherwise disposed of by buyer. If seller has any question as to the quality of his ore, it is suggested that before shipment and delivery to the purchase depot a representative sample be submited to the buyer or to one of the umpires for assay at seller’s expense. The buyer at its discretion may assay a limited number of samples without charge.
*447 (ii) Ores assaying 0.10 percent Us08 and more, as follows:

(iii) Premiums on uranium: $0.75 per pound for each pound of XJ308 in excess of 4 pounds U3Os per short ton (2,000 pounds per ton) of ore and an additional premium of $0.25 per pomid for each pound in excess of ten pounds U3O8 per short ton. Fractional parts of a pomid will be paid for on a pro rata basis to the nearest cent.
(2) Vanadium. V205 at $0.31 per pound up to, but not exceeding, ten pounds of V205 for each pound of U3Os contained in ores. No factor will be included for V205 in excess of ten pounds for each pound of UsO& although buyer may, from time to time, publicly announce that, for limited periods by written agreements with individual producers, V205 in excess of ten-to-one will be paid for. Any such announcement will be made by posting a notice to this effect at the Monticello depot and through such other channels as are deemed suitable to achieve maximum dissemination among producers. Excess V205 shall be deemed to be buyer’s property.
(3) Allowances, (i) A development allowance of $0.50 per pound U308 in ores assaying 0.10 percent U3Os or more in recognition of expenditures incurred or likely to be incurred in the development or exploration necessary for maintaining and increasing developed reserves of uranium ores. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.
(ii) A haulage allowance of 6 cents per ton mile for transportation of ore paid for under §§ 60.5 and 60.5a from the mine where produced to the purchase depot specified by the Commission, up to a maximum of 100’ miles. The haulage distance from the mine to the purchase depot will be determined by the Commission and its decision will be final. Tonnages for purposes of this allowance shall be calculated on the basis of natural weights rather than dry weights.
*448 (4) Adjustment of assays. Assays shall be adjusted to the nearest 0.01 percent for purposes of payment.
(b) Quality and size. Ores will not be accepted by buyer under §§ 60.5 and 60.5a which, in buyer’s judgment:
(1) Contain less than 0.10 percent U308;
(2) Contain more than three parts of lime (CaC03) to one part of. V205, or a total of more than 6 percent lime in the ore;
(3) Contain impurities deleterious to buyer’s extraction process or for any other reason are not amenable to it;
(4) Contain lumps in excess of twelve inches in size.
Note : The Commission will be interested in discussing arrangements for delivery to it of types of uranium-bearing materials other than those for which guaranteed prices have been established, such as tailings, mill products, and ores of types not acceptable under §§ 60.5 and 60.5a.
17. In a formal speech released to press and radio and delivered at a meeting of the American Mining Congress on August 30, 1950, Mr. Jesse C. Johnson, AEC Director of Eaw Materials, stated the AEC uranium procurement policies under Circulars 1 and 5 as follows:
Let me review briefly this program and show how it will apply to ores not covered by Circular No. 5, which relates to carnotite ores of the Colorado Plateau, or by Circular No. 1, which is for high-grade ores.
As previously indicated, the Commission’s buying schedules and policies for carnotite ores of the Colorado Plateau already have resulted in active development and production in that area. Circular No. 1, which established a ten-year guaranteed minimum price for high-grade ores and concentrates, was designed for high-grade pitchblende deposits of the type which in the past had furnished most of the world’s uranium. Except for the Colorado carnotite deposits, which were covered by a special buying schedule, we had little basis for predicting the kind of uranium deposits which would be found in the United States. There had been little interest in, and little prospecting for uranium. We considered it likely that other deposits might be found to which the Circular No. 1 schedule would not apply. Therefore, a provision was included in Circular No. 1 for special arrangements under negotiated contracts when justified by the quantity and the cost of production.
*449 Our experience during tbe past two years indicates that most domestic nraninm ores will require special schedules. Therefore, there is need for a more definite statement of price policy — a statement which gives the essential terms of ore-buying schedules that may be established and also the basis upon which the Commission will purchase high-grade mill concentrates and precipitates.
Ore-buying schedules for crude ore not covered by Circulars No. 1 or No. 5 will be established for each mill, based on the prices for uranium content set forth in Circular No. 5, the circular which applies to camotite ore of the Colorado Plateau. Contracts for construction and operation of mills will be arrived at by negotiation. It is expected that most of these contracts will be for the purchase of mill concentrates or precipitates at a unit price. The price paid for the mill product will be arrived- at by taking into account ore cost and the estimated milling cost, including plant amortization,, metallurgical losses and profit. For the purpose of such negotiations, all mills may be considered custom mills, even though the ore supply and mill may be owned by the same company. It is expected, however, that most, mills will treat at least some custom ore.
18. In addition to its announcement of the guaranteed minimum prices in Circular 1 and Circular 5, the AEC, in order to encourage the discovery of new uranium resources, and particularly as an aid to small producers, offered two-types of bonuses. By Circular 2, a bonus of $10,000 was offered, concurrently with the publication of Circular 1, upon the delivery in accordance with the provisions of Circular 1 of the first 40,000 pounds of ore or mechanical concentrates, assaying 20 percent or more U308, produced from a previously unworked deposit. The offer was expressly inapplicable to carnotite-type and roscoelite-type ores. Beginning March 1,1951, the AEC offered by Circular 6 a second bonus, the total amount of which was on a graduated scale of from $1.50 to $3.50 per pound of UsOs in accordance with the grade of ore, which was payable upon the first 10,000 pounds of U3O8 contained in ores which represented the initial production of an individual property upon their delivery to and purchase by an ore-buying station or a mill. The bonus was-not restricted in its applicability to particular types of ore.
■19. After the issuance of Circulars 1 and 5, discovery was.
*450 made in 1949 of certain low-grade uranium-bearing ores of the autunite and tobemite varieties occurring off the Colorado Plateau at Marysvale, Utah. On March 15, 1950, the -AEC established an ore-buying station at Marysvale, Utah, •to purchase such ores.
Over the succeeding years, numerous additional uranium-bearing ore deposits were discovered off the Colorado' Plateau ■over a vast area of the western United States, such ores being classified other than as carnotite-type or roscoelite-type. 'The AEC established ore-buying stations at various places to purchase such ores, in 1952 at Shiprock, New Mexico, and at Edgemont, South Dakota; in 1954 at Moab, Utah, and at White Canyon, Utah; in 1955 at Eiverton, Wyoming, and at 'Globe, Arizona; and in 1956 at Tuba City, Arizona, at 'Grants, New Mexico, and at Crooks Gap, Wyoming.
These and later buying stations were temporary means of providing a market for newly discovered and developed uranium ores, and each of such buying stations was closed as soon as privately-owned milling facilities were provided in the particular area, pursuant to a negotiated contract between the mill operators and the AEC for the purchase by the latter of uranium concentrate produced.
20. Throughout its operations, the AEC has uniformly followed its announced policy of purchasing from any one producer without written contract up to 1,000 tons per year of uranium ore, meeting Circular 5 standards, at its buying station at Monticello, Utah. Any purchase at Monticello of such ores from any producer in excess of 1,000 tons per year has been made only pursuant to written contract negotiated between the AEC and such producer.
All purchases of uranium ore at any other AEC buying station, irrespective of the tonnage sold by any producer in any year, have been made only pursuant to written contracts negotiated between the AEC and the producers.
All purchases of uranium concentrate by the AEC have been made only pursuant to various formal contracts negotiated between the AEC and the various mill owners. Each of the uranium concentrate contracts, commonly referred to as mill contracts, was negotiated and executed prior to the construction of the uranium concentrate mill.
*451 The AEC program of entering into formal contracts for buying of uranium ores and purchase of uranium concentrates pursuant to negotiated mill contracts was widely publicized and constituted common knowledge throughout the ■domestic uranium industry.
21. As uranium-bearing ore discoveries extended beyond the Colorado Plateau and to ores other than carnotite-type •and roscoelite-type, the TJ308 price schedule and conditions ■of Circular 5 were applied to purchases of such ores in all •areas except the lignite-ore area of North Dakota. Repeated public amiouncements were made that the Circular 5 price ■schedule and conditions would be so applied, both in the various press releases concerning establishment of the various new ore-buying stations and in various public speeches released to the press and delivered by officials of the AEC. The ore-buying contracts expressly applied Circular 5 prices.
The mill contracts uniformly and expressly provided as part of the formula for fixing the price to be paid for uranium concentrate, the factor of allowance of Circular 5 prices for the uranium ore processed, whether such ore was that produced by the mill operator or custom ore sold to the mill by another producer. In fact, the mill contract required the mill operator to pay not less than Circular 5 prices to the producer of custom ores.
The purpose of using the price schedule of Circular 5 in both ore-buying contracts and mill contracts was to establish an ore price as nearly uniform as possible, subject only to provided penalties and to determination of amenability of the ore. The policy of the AEC was that no lesser or greater prices should be paid for ores purchased off than on the Colorado Plateau.
22. Each concentrate contract, or mill contract, in the domestic uranium program was negotiated with the owner or owners of a substantial supply of amenable uranium ore in the area to be served by the mill. As expressly provided in each of such contracts, the AEC required that to the extent of a specified percentage of the pertinent mill capacity, the mill owner purchase and process uranium ores, produced in the area by independent miners, when such custom ores met the standards of Circular 5.
*452 Each of such mill or concentrate contracts was by its terms not subject to cancellation by unilateral action of the AEC, and, in accordance with the terms thereof, the mill operator was guaranteed or assured a firm level of procurement during the period covered by the contract. The custom ore producers in that area as a group were assured a market at the mill to the extent of their respective participation in the sale to the mill owner of the custom ores required to be processed.
23. Throughout its domestic uranium procurement program, the AEC issued press releases and otherwise released information about uranium developments by means of speeches delivered by its officials. The press releases reiterated military need of uranium, that the Government was the only purchaser of uranium and would probably remain so until the 1960’s, and that the AEC program provided a guaranteed market for uranium concentrate produced by mills and for uranium ores purchased by mill owners or by the AEC.
On May 24, 1956, the AEC issued a public announcement concerning a new domestic uranium procurement program, as follows:
The U.S. Atomic Energy Commission today announced establishment of a new domestic uranium procurement program for the period from April 1, 1962 through December 31, 1966, and an extension of the initial production bonus for uranium ore from February 28, 1957, its present expiration date, through March 31,1960.
The new domestic procurement program provides a guaranteed market for all uranium concentrates produced by domestic mills from domestic ores, subject to a limitation, at the Commission’s option, of 500 tons of TTsOs per year from any one mining property or mining operation and to compliance with Commission specifications. Hie price established is $8.00 per pound of U308 contained in normal mill concentrates or precipitates.
This action was taken in recognition of the need for a continuing Government market in order to maintain a high rate of exploration and development. Although domestic uranium production has shown a remarkable expansion, known ore reserves will be greatly depleted by *453 1962 unless extended by aggressive development and exploration. A high, rate of discovery is essential if substantial production is to be maintained after that date. The new domestic uranium procurement program provides assurance of a government market for an additional period of almost five years beyond March 31, 1962. This assurance will assist uranium mining and milling firms in planning future operations.
The present uranium ore procurement program will remain in effect until March 31, 1962. The new program establishes a base price for domestic uranium concentrates, rather than ores, for the period from April 1, 1962, through December 31, 1966. The base price will be $8.00 per pound of U308 contained in concentrates meeting specifications. This price will be applicable to the type of concentrate, i.e., high grade chemical precipitates, which is being purchased presently under negotiated unit price contracts with milling companies.
The $8.00 price was determined on the basis of a study of existing contracts, known sources of supply and estimated costs of production.
A gradual transition from a government-controlled uranium market to a commercial market is expected to take place as industrial demand for uranium develops. Commission regulations permit the private purchase, sale and use of source materials under Commission license, with restriction only on certain uses such as utilization as a coloring agent in ceramics. Under the new procurement program, producers will be able to sell to licensed domestic commercial users in addition to the Commission.
Uranium concentrate producers desiring to sell to the Commission will be required to enter into contracts specifying the period of delivery, the quantity to be delivered, the rate of delivery, the place of delivery, the type of packaging and other standard provisions of commercial-type contracts. The contracts may cover the period April 1, 1962, through December 31, 1966, or a shorter period. The Commission, at its option, may limit the purchase of concentrates derived from any one mining property or mining operation to 500 tons of Us08 per year. Depending upon requirements additional quantities may be purchased. Such purchases of additional quantities may be at prices lower than $8.00.
Negotiated contracts executed prior to March 31,1962, may provide for amortizing the cost of milling facilities over a period extending beyond March 31,1962, with an amortization factor added to the $8.00 price established *454 for the extended program. The amortization must be on not less than a five-year basis. _ If milling facilities are amortized or partially amortized under contracts executed with the Commission prior to March 31, 1962, the Commission may require that a reasonable percentage of mill capacity be made available for treatment of purchased or custom ores. There will be no commitment for the purchase of vanadium after March 31, 1962.
Pertinent details of the new program will be published at a later date.
The initial production bonus, which has been in effect since 1951, is paid on the first 10,000 pounds of uranium ■oxide in ore delivered from an eligible mining property to an authorized buying station or mill. The bonus ranges from $1.50 per pound of uranium oxide in ore assaying 0.10 percent uranium oxide to $3.50 per pound of uranium oxide in ore assaying 0.20 percent uranium oxide and above.
The bonus has encouraged prospecting and exploration by giving the prospector and small miner assistance during the early stages of development and mining.. In the case of mines in new areas remote from mills or buying stations, the initial production bonus may be an important factor in enabling the miner to ship his ore during the development period.
The initial production bonus also has sustained small marginal operations for considerable periods, and some of these have developed into profitable mines. Extension of the bonus for three additional years is expected to provide continued stimulus to prospecting and small mining operations.
Prior to May 24,1956, all negotiated mill contracts provided for their termination on March 31,1962, the expiration date of Circular 5, Bevised.
24. By the end of 1956, due in large measure to the monumental discoveries in the Ambrosia Lake area near Grants,. New Mexico, total uranium ore reserves had risen to more than- 60,000,000 tons, approximately half of which were in the Ambrosia Lake area. During the same year, the commencement of operation of new mills and the expansion of existing mills had doubled the domestic concentrate production capacity, and eight new mills with a total production capacity equal to the 1956 increase were scheduled to begin operation within approximately the following year.
*455 The general extent of the Ambrosia Lake developments, was a matter of common knowledge within the uranium, industry in 1956.
The extent of domestic uranium ore reserves was information which was classified and not réleased for publication or-dissemination until December 13, 1956. 'On that date, the-AEC declassified domestic ore reserve statistics for the period June 30, 1955, to December 13,1956. On December 1,19.59,. the AEC declassified such statistics for the period from 1948. to 1959,. Such reserves increased from 1,000,000 tons in 1948, to 5,000,000 tons in 1953, to 27,000,000 tons in 1955, to-63,000,000 tons in 1956, and to 88,900,000 tons in 1959.
25. In a speech delivered on February 9, 1957, before a meeting of the National Western Mining Congress at Denver,.. Colorado, Mr. Johnson, reviewing the rapid increases in uranium ore reserves and milling facilities in relation to the-military requirements programmed through 1966, noted the-concern being expressed within the mining industry over the-possibility that excess milling capacity would result from continued expansion of concentrate procurement for short-run requirements. He indicated that, in assessing concentrate contract proposals, the AEC would henceforth look;toward a prospective ore supply in the area of the mill sufficient to sustain mill operations at least through 1966 in order-to assure continuity of procurement through the extended purchase program period and-a gradual and sound transition, to a commercial uranium market.
He observed that in past years, in an effort to meet the-urgent military demands, concentrate contracts had often been negotiated and mills consequently constructed on the-strength of known ore reserves sufficient to sustain operations-for only 5 years, and in some instances for shorter periods-, on the “speculative chances of finding enough ore,” but that such practices were no longer justified. He sounded a note-of warning to those ore producers who had “come to expect a-market for all the ore they could produce as fast as they could produce,” and he cautioned them that it would become-increasingly necessary thenceforth that they plan their operations with a view to more extended marketing periods consistent with existing milling facilities.
*456 26. On October 28, 1957, Mr. Johnson delivered a speech (released to the press on the same date but never published in the Federal Eegister) before the Fourth Annual Conference of the Atomic Industrial Forum in New York, and announced that, by reason of a decision of official policy determined by the Commission, limitations were being imposed upon the further expansion of concentrate purchase commitments. Mr. Johnson’s statements were approved in advance by the Commissioners of AEG, and pertinent parts were as follows:
* * * we have arrived 'at the point where it no longer is in the interest of the Government to expand production of uranium concentrate. It has been apparent for some time that this point was being approached. Keference was made to the changing uranium supply situation in the Commission’s report to Congress on the Development, Growth and State of the Atomic Energy Industry (the so-called Section 202 Hearings) in early 1956 and again in 1957. In my talk to the National Western Mining Conference in Denver in February of this year, I stated that “Now that we no longer are faced with a uranium shortage, our methods of operation must be reviewed in the light of changed conditions.” Since the beginning of this year, the possibilities of additional major increases in domestic uranium production have become apparent.
It would be undesirable from the standpoint of industry, as well as the Government, to expand the uranium production rate beyond currently projected requirements and then be faced with a major curtailment at some later date. The objective should be to have a strong uranium industry, with substantial ore reserves, capable of expanding to meet the requirements for atomic power as these requirements develop.
Under these circumstances the Commission, at this time, is faced with limiting commitments for additional domestic uranium production. Proposals for domestic contracts which already have been submitted and are under review still will be considered in the light of the discussions which have taken place. In some instances these discussions were initiated a year or more ago.
With respect to new proposals between now and 1962 for additional mill construction or mill expansion, the objective of the Commission will be to limit production to the approximate level which will be reached as a result of existing commitments. If new contracts are considered, preference will be given to providing a limited *457 market for areas having no present milling facilities. Extensive development of new areas, or producing areas, should not be based upon the assumption that there is a current market for all the uranium that can be produced. * * # * *
27. During the period of time between October 28, 1957, and April 2, 1958, the AEC withdrew or suspended the authority of its procurement officials to negotiate any new uranium concentrate or mill contracts which had not been approved in substance before October 28,1957.
During this period, a comprehensive study was made by Grand Junction of the ore reserves and milling capacities in the various producing areas, and on April 2, 1958, the AEC authorized a “limited expansion” of concentrate purchase commitments in those areas in which, in the judgment of the AEC, the existing capacity was insufficient to provide a reasonable market for the ores of those areas. Contract proposals were subsequently entertained which led to the construction of several new processing mills and in the expansion of existing mills, primarily in certain areas of Wyoming in which ore reserves were extensive.
The Grand Junction study of the milling capacities of various producing areas likewise led to the designation of six areas in which existing milling facilities were considered by Grand Junction to be adequate in relation to the ore reserves of those areas, but in which substantial increases in the reserves of independent ores had been established after the execution of the concentrate contracts and in which certain problems might therefore be found to exist with respect to provisions for the marketing of independent ores on an equitable basis.
28. On November 24, 1958, the AEC announced that the 1962-1966 domestic uranium concentrate program was to be modified. This announcement was published in the Federal .Register and stated the following:
1. On May 24, 1956, the Atomic Energy Commission announced that it would guarantee the purchase of Us08 in concentrates produced and delivered during the period April 1, 1962-December 31, 1966. The Commission will carry out its May 24, 1956, commitment with respect to ore reserves developed prior to this date in *458 reliance upon the May 24, 1956, announcement by negotiating for the purchase of appropriate quantities of concentrates derived from such ore reserves during the 1962-1966 period. Such purchases will be at the previously established price of $8.00 per pound for U308 in an acceptable concentrate.
2. By issuance of this announcement the Atomic Energy Commission hereby withdraws prospectively the concentrate purchase program announced May 24, 1956. With respect to new ore reserves developed after this date, the Commission will make contracts to purchase concentrates to the extent that requirements dictate and on such terms and conditions and at such prices as the Commission may from time to time agree upon. Future programs will give due consideration to the adequacy of domestic ore reserves, the need for exploration and development, the maintenance of the domestic uranium industry, and other factors which may be important to the Atomic Energy Program.
3. The effect of this modification will be to provide the domestic uranium industry with a substantial continuing market for the period 1962-1966 for concentrates derived from already developed ore reserves and, at the same time, guard against overproduction.
4. Under this revised program the Commission’s 1962-1966 domestic uranium concentrate purchases from ore reserves already developed will be limited to:
(A) Current milling contracts;
■(B) Appropriate extensions of current mining contracts to the extent the Commission determines that the milling facilities are needed for the presently existing mining operations and developed ore reserves;
(C) New milling contracts or amendments to existing contracts which may be executed pursuant to the Commission’s April 2, 1958, announcement of the limited expansion of the domestic uranium procurement program;
(D) New .milling contracts or contract amendments which may be negotiated for the purchase of appropriate quantities of concentrates in the 1962-1966 period from ore reserves developed between November 1,1957, and the date hereof.
5. The action taken today is to guard against serious overproduction which might occur under an unlimited purchase program if very large additional uranium dis *459 coveries are made. The Commission’s action recognizes the. need for placing definite limitations on annual deliveries of concentrate and at the same time it gives due consideration to those who already have developed ore reserves in reliance upon the Commission’s 1956 announcement. Protection will be given the independent miners by incorporating in all new milling contracts and extensions to existing milling contracts provisions designed to provide independent mine owners a fair share of available milling capacities.
6. Today’s action is not due to any forecast of a reduction in the Commission’s uranium requirements or in the potential requirements for commercial atomic power. However, it is in the best interest of both the industry and the government to hold uranium production in reasonable balance with requirements.
29. After the completion of the expansion authorized by the AEC, the following private mills, under the ownership of the indicated contractors, were in operation:

*460 SO. In the fall of 1954, discovery was made by members of the Spokane Indian Tribe of uranium-bearing ore deposits on the Spokane Reservation, located near Ford, Washington, about 40 miles northwest of Spokane. These deposits became known as the Midnight mine, the operators of which constructed the Dawn mill as hereinafter related. The 1954 discovery stimulated various uranium ventures in the area, including among others those of plaintiff Northwest Uranium Mines, Inc., called Northwest.
31. The principal organizers of Northwest were Dr. Frank E. Scott, Clark L. Wilson, and Jack D. Gay, respectively its president, vice president and general manager, and treasurer.
Northwest was an Idaho corporation, which, prior to the change of name on May 2,1955, was known as Empire Silver Lead Corporation. Empire had been only a corporate shell, without issuance of any of its authorized stock and without any business activity.
The development of Northwest as an active corporation involved plaintiff Silver Buckle Mining Company, an Idaho corporation, hereinafter called Silver Buckle, and three other corporations, Fortune Mining Company, Eastern Lead Mines, Inc., and Pathfinder Uranium Corporation. The original operating capital of Northwest of $60,000 was derived from Northwest stock purchases of $15,000 by each of the four companies named. Shortly after May 1955, various parties in the Spokane area known as the Stansbury Group acquired a stock interest in Northwest in exchange for permits and leases.
32. Dr. Scott, Mr. Wilson, and Mr. Gay initially acquired stock in Pathfinder, Eastern, and Fortune by exchanging leases for shares of stock in each of these companies. As of July 1, 1956, the shares of stock held by each of these men in such companies were as follows:

*461 By exchanging leases for shares of stock, Scott, Gay, and Wilson had each acquired 45,000 shares in Northwest as of July 1, 1956, when Northwest had outstanding 2,200,000 shares.
In December 1956, Pathfinder, Eastern, and Fortune were merged into Northwest. The basis of the merger was the issuance of one share of stock in Northwest for the surrender of five shares in Pathfinder, Eastern, or Fortune.
After the merger, Mr. Gay held 258,400 Northwest shares, Dr. Scott owned 254,933, and Mr. Wilson, 131,000 of the 2,690,000 outstanding Northwest shares. Silver Buckle was not merged into Northwest, and as of January 1,1957, held 480,000 Northwest shares.
33. Dr. Scott and Mr. Gay had been associated for many years in mining ventures in the Wallace, Idaho, area. The former was president of Silver Buckle, Fortune and Eastern; the latter was treasurer of Silver Buckle. Together through their substantial share ownership and positions as officers, they probably had working control of Fortune and Eastern.
Mr. Wilson was vice president and manager of operations of Silver Buckle, of Pathfinder, and of the New Park Mining Company of Salt Lake City. New Park Mining Company and its associates, Oil, Inc., and East Utah Mining, owned blocks of stock aggregating over 1,800,000 shares in Silver Buckle. Pathfinder was in turn controlled by officers of New Park Mining and Silver Buckle.
34. The actual dollar expenditure by Dr. Scott and Mr. Gay for their Northwest stock, not considering the time, effort, and expenses incurred in locating and perfecting title to the various leases surrendered for stock, amounted to approximately two cents per share, or a total investment by each of somewhat over $5,000. Silver Buckle actually expended six to seven cents per share for its 480,000 Northwest shares. The record does not show Mr. Wilson’s cash expenditures for Northwest stock.
35. Northwest purchased a Piper D 18-A airplane and retained an experienced pilot, and during the summer and early fall of 1955 conducted an airborne reconnaissance program in the Spokane area, employing a scintillometer in the *462 low-flying airplane to detect radiation “anomalies” which might indicate existence of uranium-bearing .ore deposits. Some 25 to 27 anomalies were located and checked by Northwest personnel. Only one of the anomalies proved to be of sufficient interest to warrant development, located on the Spokane Indian Beservation in the vicinity of the above-mentioned Midnight mine.
On September 27, 1955, two Spokane Indians, Clarence Peters and Baymond Boyd, were issued prospecting permits. ■The Peters permit covered 2,440 acres of land, and the Boyd permit, 2,360 acres, on the Spokane Indian Beservation, and these permits covered all of the Northwest uranium ore deposits hereinafter mentioned.
•Assignment of the prospecting permit of Clarence Peters was obtained by Northwest, following the required approval of the Tribal Council and Indian Agency representative, on October 21, 1955. Somewhat later, Northwest obtained an assignment of the Boyd permit.
, 36. Northwest employed Mr. Gale Hansen, a graduate geologist with extensive experience as a mine superintendent, as superintendent of operations on the Northwest deposits on the Spokane Indian Beservation.
Northwest’s general manager was Mr. Clark Wilson, who was a graduate and registered geological engineer, holding an M.S. degree in geology from the University of Arizona, and who had completed the advance management course at Harvard Business School. Mr. Wilson had had extensive mining experience, having held various positions, including manager of operations of the successful New Park Mining Company.
37. Immediately following the assignment of the Peters permit to Northwest on October 21, 1955, Mr. Wilson visited the Northwest property. Between that time and December 1, 1955, Northwest employed a TD-14 bulldozer for 104 hours stripping overburden to expose the uranium-bearing rock formations for examination. Some preliminary drilling of the property was done in the fall of 1955 under the supervision of Gale Hansen, who prepared maps of the bulldozer cuts and drill holes.
*463 ■ In November 1955, Mr. Wilson visited the Defense Minerals Exploration Administration (DMEA) office at Spokane, Washington, and held preliminary conversations about the possibility of a mineral exploration program on the Northwest property.
Heavy snowfall in December 1955 forced discontinuance of any further work and delayed development activities until the following spring. After further -negotiations with DMEA personnel, Northwest’s application was approved and a contract executed by DMEA on June 15, 1956, which agency financed part of the exploration costs in developing the Northwest ore body. This contract was amended on November 22,1957, and thereafter DMEA certified discovery of ore deposits on the Northwest property.
38. By letter dated December 10, 1955, Northwest by Mr. Wilson advised the then manager of Grand Junction that Northwest had a favorable uranium prospect on the Spokane Indian Reservation, that six or eight deep bulldozer trenches had exposed a series of sedimentary beds in which uraninite mineralization was found scattered, and that chemical assays indicated a good commercial deposit. The letter further stated:
Several of the large companies have approached us for some sort of deal on this property. In our talks with them we have made the point that we want to try and retain some interest in the concentrate to insure a depletion allowance to our company.
As we see the situation there are three alternatives to achieve this end. The first, of course, would be for us to have an integrated mining and milling operation, which would mean that Northwest would have to provide the entire financing one way or another.
The second alternative would be for Northwest to retain a partial ownership with some other company in a uranium mill in this. area. We feel that this would be an avenue for retention of the depletion allowance.
The third possibility would be for Northwest to have its ore milled by some other company on a toll basis. Our question to you is two-fold: 1. Can we enter into negotiations with the Atomic Energy Commission to sell to you a concentrate from our ore that is treated by some other mill on a toll basis. Another phase of this question might be, can we enter into a contract whereby *464 we have our ore treated on a toll basis then sell the concentrate to the milling firm.
We feel these are both legitimate propositions and would be particularly interested in knowing whether or not there lias been any past experience with the Atomic Energy Commission in these types of arrangements.
I have noticed the recent publicity regarding your proposed change in positions, and while we hate to lose you out here in the West, we do hope that the new work back East will be pleasant and interesting.
39. As the then deputy manager of Grand Junction, Mr. Allan E. Jones (manager from February 1956) responded to Mr. Wilson by letter dated December 14, 1955, stating that AEC could not advise Northwest concerning depletion allowances as such matters involved regulations administered by the Federal Bureau of Internal Revenue. Regarding Northwest’s uranium prospect on the Spokane Indian Reservation, the letter stated:
If you are interested in the possibility of constructing a mill to process ores produced in the Spokane area, the procedure followed by the Commission is to consider detailed proposals submitted by private companies for the construction and operation of a plant and the sale to the Commission of uranium concentrates produced. Concentrates meeting required specifications are purchased by the Commission at unit prices under the terms of negotiated contracts.
In formulating a proposal, the company should make a thorough investigation of the potential ore supply, possible mill sites, possible processing methods, and the cost of constructing and operating a mill for the efficient treatment of the particular ores.
As a matter of good business, the processing company which finances and builds the plant usually assures itself of an adequate ore supply through ownership or contractual arrangements with the ore producers. Since an adequate ore supply is a prerequisite for an economic plant operation, it would seem logical to develop suitable data concerning available ore reserves on which to base a mill proposal.
We are very pleased to learn of your company’s interest in the Spokane area and are ready to discuss further with you the possibility of constructing a plant in the area should your investigation of the available ore reserves appear to justify a plant operation.
*465 As related in subsequent findings, the negotiations between Grand Junction and the owners of the Midnight mine for the Dawn mill contract started about the date of this letter, or shortly thereafter.
Northwest did not reply to this letter, nor were any further letters received by AEC from Northwest pertaining to mill proposals or concentrate negotiations until July 1957, as hereinafter related.
40. During the winter of 1955-56, Northwest submitted six ore samples to the Spokane office of AEC. Pursuant to arrangements made by AEC, defendant’s Bureau of Mines conducted microscopic and chemical analyses of such samples, without charge to Northwest. On February 1, 1956, the AEC’s Salt Lake Explorations Branch provided the report on the samples to Mr. Wilson. The assays showed that uranium mineralization in the ore samples was meta-autunite, and that the U808 content ranged from .07 percent to .486 percent. The Northwest ore deposits were not carnotite-type or roscoelite-type.
41. On February 6, 1956, Northwest made application to Defense Minerals Exploration Administration (DMEA) for a loan to finance exploratory operations, to determine the nature, extent, and location of the uranium-bearing ore deposits on the Northwest property. While the DMEA application was pending, Northwest did some bulldozing and drilled seven drill holes at its own expense. The loan application was granted and the exploration contract executed with DMEA on June 15, 1956, in the amount of $29,160. Exploratory drilling operations under this contract were thereafter conducted on the Northwest property through October 1956, with 110 percussion and diamond drill holes cut at intervals of 100 feet.
At the time of the execution of the DMEA contract, Northwest employed Mr. George Cloward, who had served 8 or 9 years as assistant foreman of operations with the Tintic Standard Mining Company, to serve as assistant to Gale Hansen, Northwest’s mine superintendent.
On July 15, 1957, Northwest drilled four additional holes independent of the DMEA contract. In all, 150 percus *466 sion-type and 15 diamond drill holes were completed on the Northwest property.
Each month Northwest performed the drilling work on the property pursuant to the DMEA contract, paid expenses as they arose, and at the conclusion of the month recouped from DMEA 75 percent of the amounts expended.
42. In Northwest’s drilling operations, 460 samples were taken of cuttings from the drill holes and tested for Us08 content, drill logs were kept showing depth of overburden and thickness of uranium ore in each hole, and maps were prepared showing cross sections of some holes, the contours of the property, and the number and location of each drill hole. A detailed estimate of mining costs was computed on the basis of amount of overburden to be blasted and/or stripped, and costs in the way of labor, capital investment, depreciation of equipment, interest, taxes, fuel, repairs and other items.
As a result of the drilling, assaying and mapping program at the Northwest property, Northwest made an estimate that its ore deposits contained 683,660.48 tons of uranium ore, assaying an average concentration of .1169 percent U308, containing 1,578,244.33 pounds of U808. With the additional drilling of four holes in July 1957, Northwest increased its original estimate to 702,537.08 tons of uranium ore, assaying an average of .1224 percent XT308, containing 1,719,810.77 pounds of Us08.
In making such computations, Northwest used a “cut off point” of .06 percent U808, that is, considered only ore having that percentage, or more, of UaOg.[1] In the spring of 1957, Northwest computed the Northwest ore reserves by using a .10 percent cutoff to be 416,028.06 tons of uranium ore, averaging .167 percent U308, containing 1,389,533.72 pounds of U308.
*467 The AEC Spokane office engineer on the basis of drill logs, maps, and other information furnished by Northwest computed in January 1957 that the Northwest uranium ore deposits on a .06 percent cutoff contained 616,009.75 tons of ore averaging .116 percent U308, and computed in August 1957 that such deposits on a .10 percent cutoff contained 341,000 tons averaging .166 percent U308 (lower than the Northwest estimate because less drillings were considered).
Folio whig completion of its drilling under the DMEA program, and on the basis of the data thereby provided, Northwest was able to and did designate the 160 acres for which Peters could apply for a lease -under the permit. A lease thereon was granted to Peters by the Tribal Council and the Agency representative on November 10, 1956. Assignment was thereafter made by Peters to Northwest on November 20,1956, and approved by the designated authorities in February 1957.
43. In late 1955 or early 1956, the Dawn Mining Company, operator of the first discovery on the Spokane Eeservation, the Midnight mine, initiated discussions with respect to prospective milling facilities and a concentrate contract with Grand Junction. In the late summer or early fall of 1955, Dawn employed Mr. E. E. Porter, a recognized and well qualified metallurgist with substantial experience in the milling of concentrates from uranium-bearing materials and the design of processing mills for this purpose. As of that time, Northwest had not yet obtained a permit to prospect on the Spokane Indian Eeservation.
44. Preliminary discussions between Dawn and Grand Junction extended until April 1956, when Dawn submitted its formal mill proposal as a basis for concentrate contract negotiations. There ensued, as with all mill proposals and prospective concentrate contracts, a detailed review, analysis and evaluation by AEC of all factors pertaining to the proposal and the prospective procurement, as well as extended negotiations between personnel of Dawn and the AEC with respect to all phases of the proposal and prospective contract provisions. Usually such negotiations require 6 months of time. Dawn’s efforts to procure a concentrate contract and the pendency of its negotiations with the AEC with respect *468 thereto were matters of general knowledge in the industry for some time prior to announcement of its consummation in August 1956.
45. The terms of all uranium concentrate or mill contracts were individually negotiated between AEG and the various private companies who owned and operated the mills. It was necessary to investigate and establish that sufficient reserves of uranium ore of adequate grade were available to sustain milling operations for an adequate period of time, that such available ores were amenable to economical metallurgical processing, that adequate design had been prepared for the mill, that the proposed mill operator had management ability and financial capacity, and that an acceptable price to the AEG could be reached. The contract price for uranium concentrate varied from contract to contract and was negotiated on the basis of consideration of such factors as the “ore cost”, determined by application of the Circular 5 price schedule to both captive and custom ores, the estimated milling costs, which varied depending upon the size of the mill and the metallurgical process required for the particular ore, amortization of the cost of the mill in relation to the life of the uranium concentrate contract, and a reasonable profit to the mill owner, arrived at by consideration of capital investment and related factors.
The Grand Junction manager was authorized to negotiate a uranium concentrate or mill contract, and could execute such a contract for the AEG after approval of the proposed contract by AEG officials in Washington, D.C.
46. One of the major factors considered by AEG in its negotiations with Dawn (as with all mill proposals) was the need for a mill in the area, including an evaluation of the ore owned or controlled by the prospective contractor as well as the known and potential uranium-bearing deposits of “custom” ore tributary thereto, and for which independent producers the prospective mill would provide a market. It was the conclusion of AEO that the ore reserves of the area, as projected from the incomplete exploration and development then accomplished, were sufficient to support a milling operation, and, through the medium of a concern- *469 trate contract, a market would be provided for tbe producers of the area.
The AEC consideration of the Northwest deposits as tributary to the proposed Dawn mill was necessarily limited to information supplied by Northwest to AEC personnel in the way of drilling logs prepared by Northwest on holes drilled as of June 15, 1956, prior to the commencement of the DMEA-financed project, as well as a map, prepared by a Northwest geologist, delineating the ore body on the basis of limited drilling and geological extrapolation.
47. Negotiations between Dawn and the AEC culminated in a formal written unit price contract for the purchase from Dawn by the AEC of high-grade specification concentrate, containing a minimum of 75 percent U308, and which, following the required submission to and approval by the Commission in Washington, D.C., was finalized and executed under date of August 8, 1956.
48. On August 9, 1956, the AEC issued a press release announcing that the AEC and Dawn Mining Company had signed a contract for operation by Dawn of a uranium processing mill to be constructed within 12 months and located 40 miles northwest of Spokane, Washington. It was stated that the new mill would process ores from the newly-developed region, including ores developed by Dawn as well as ores bought from independent producers.
49. The Dawn mill was designed and constructed for processing 400 tons of uranium-bearing ore per day and, consistent with AEC policy, was to process both the “captive” ores of Dawn and the “custom” ores of independent tributary producers. The contract provided that 25 percent of the mill capacity would be devoted to metallurgically and economically amenable custom ores of the area which Dawn was required to purchase from independent producers at prices for the U308 content thereof which were not less favorable to the producers than those in the price schedule of Circular 5.
The Northwest ores were metallurgically and economically amenable to the processes of the Dawn mill, however, because of processing difficulties and the 100 ton per day limitation (actually 20 tons if Dawn chose to buy from other independents) , the Dawn Mill 'did not provide a substantial market for *470 Nortbwest ores. Tbe unit concentrate price in the Dawn contract was negotiated and based on an assumed weighted average grade of ore fed to process of .19 percent U3Oa. The weighted average ore grade provided in the Dawn contract, .19 percent U308, was one of, if not the lowest, in any concentrate contract, the grades in all contracts averaging from .24 percent to .27 percent UsOs or an average of not less than .25 percent TJ308.
50. In August or September 1956, Mr. Wilson contacted Mr. Porter, the consulting metallurgist who designed the Dawn mill, stating that the Northwest deposit was of a lower grade than was normally treated in the mills and inquired of Mr. Porter whether there was any feasible or economic method of treatment which would produce a product from this deposit which Northwest could sell to another mill.
Mr. Porter’s initial participation in the program of Northwest was to ascertain whether this low-grade material could be chemically upgraded to produce a product which Northwest could then sell to one of the existing mills, specifically Dawn or Vitro, and from which the purchasing mill contractor could, with further processing, produce specification concentrates which it could sell to the AEC under its concentrate contract.
Mr. Porter was fully versed in the specification requirements of AEC concentrate contracts and all phases of its concentrate procurement program; he knew that the AEC purchased high-grade concentrates only under the express terms and provisions of written contracts with the processor; he further knew that the AEC did not purchase and was not interested in purchasing any upgraded product; and he did not expect or intend that the proposed product, if developed, would be purchased, or offered for purchase, to the AEC.
51. Pursuant to the request of Northwest, Mr. Porter made amenability tests on ore samples provided him by Northwest personnel, metallurgical studies, and explored various approaches on the method of treatment to upgrade the ore. He decided that the ore could be treated or chemically upgraded to produce a wet solution in which the solids, when dried, contain approximately 8 percent U308. By further processing of1 this 8 percent slurry through circuits of an *471 other mill, a concentrate containing 70 percent UsOs would purportedly be produced.
52. On or about January 3,1957, a conference was arranged by Mr. Wilson with the Grand Junction manager, Mr. Jones, with Mr. Porter also in attendance. The purpose of the conference was to bring to Mr. Jones’ attention the 8 percent slurry program on which Mr. Porter had been engaged. The discussions involved explanations by Mr. Porter relative to the technical processes, an indication of direction of inquiry in his research, and rough calculations as to production costs. Questions arose and were discussed with respect to the disposition by Northwest of such a product as the suggested “slurry,” if produced, to existing mills holding concentrate contracts with AEC, specifically Dawn and Vitro. Mr. Jones stated that this was a matter that they would have to negotiate with the mills, and he suggested that they contact the processors in this regard, and Northwest’s representatives indicated they would do so.
It was well known by the conferees that the AEC’s purchases were limited to high-grade specification concentrates under contracts with the processor, and that it had never purchased nor was it interested in purchasing any chemically upgraded material or low-grade concentrate such as this slurry. However, Mr. Jones reiterated this AEC policy. Insofar as Mr. Porter was concerned, his participation in the conference was not to request the AEC to purchase such a product, but was only to explore the possibility of the sale of this product by Northwest to processors holding concentrate contracts with AEC.
53. On April 6, 1957, Mr. Jones addressed an industry conference at Moab, Utah, and stated that AEC had never purchased and did not contemplate the purchase of uranium products from upgrading plants, that the physical characteristics of such material made it unsuitable for stockpiling, that such material should be supplied to a mill where high-grade concentrates are produced, but that such material would not be acceptable to a mill operator unless its metallurgical characteristics were suitable to the particular process being used in the plant.
*472 The foregoing statements of Mr. Jones were in accordance with established policy of the AEG, well known in the uranium industry.
54. Following the January 3,1957, conference, Northwest’s representatives made contacts with Dawn and Vitro to ascertain whether any arrangements could be made to sell them the slurry, if produced. Vitro, located at Salt Lake City, Utah, was dependent entirely on custom ore, and indicated that the material could be intoduced in its circuits. It further advised it would be interested in making some arrangements with Northwest if the AEG would increase the quantity provisions of its concentrate contract to cover the material. Introduction of the proposed material into the mill circuits of Dawn would have required alterations to the existing plant, but Dawn indicated it might be willing to accomplish the plant changes and process the slurry if the AEO would increase the quantity limitations of its concentrate contract.
Shipment to Vitro at Salt Lake City involved substantial freight costs as well as drying, drumming, and packaging. The wet slurry solution could be sent in tankers to Dawn, but processed only after expensive plant alterations. Prices quoted by Vitro and Dawn to Northwest were deemed to be prohibitive.
55. By letter dated July 13,19-57, Northwest, by Mr. Wilson, submitted the following request to the Grand Junction manager, Mr. Jones:
Northwest Uranium Mines, Inc. with executive offices at 907 Walker Bank Building, Salt Lake City, Utah, wishes to enter into negotiations with the Atomic Energy Commission for the installation of a uranium concentrator and for the sale of a minimum quantity of 1,200,000 pounds of UsOs.
The contemplated concentrator does not follow the usual uranium plant design in that we will produce a low grade concentrate assaying approximately 8% TJ3Ob from ore assaying 0.124% U308, and it is anticipated that the product will be processed further in an existing mill. This can be done either on a custom basis or by contractual arrangement between the Atomic Energy Commission and that mill. In this way the capital expenditure and operating cost of a concentrator can be kept at a minimum. Thus it is possible to treat this low *473 grade ore on the basis of a small scale operation at a concentrate price comparable to that paid for similar grade ores of foreign origin. It is difficult to compare this operation with domestic prices as the milling facilities in this country treat higher grade ores, we estimate that the low grade concentrate can be produced at the mill, either as a slurry or a filter cake, for $7.71 per pound of contained U308 before amortization. This cost is broken down as follows:

The proposed concentrator will treat 400 tons of ore per day and we expect to recover two pounds of U308 per ton of ore. The Northwest Uranium Mines, Inc. have developed by drilling approximately 603,000 tons of ore averaging 0.124% U308 on the Peters Lease that is located on the Spokane Indian Reservation approximately 50 miles northwest of Spokane, Washington. We have a 10 year lease on 160 acres in the SW% of Section 35, Township 38 North, Range 37 East. This ore reserve allows for at least a four year operation at this daily tonnage rate.
The concentrator will be erected at the mine site to eliminate haulage charges and the flow sheet as developed will not accommodate custom ore. The cost of this facility, including accommodations for the operating staff is estimated to be approximately $1,800,000.00, or an amortization figure of $3.00 per ton of ore that is now expected to be available for treatment. This amounts to $1.50 per pound of U308 recovered.
Studies have been made on the water supply, power, and tailings disposal problems connected with this installation, and both power and water are readily available. The disposal of waste effluents is not a serious problem as the milling solutions after neutralization are reused in the circuit.
In establishing the price of the ore feed to the plant, it would seem logical to us to establish a firm price based on the estimated ore reserve grade because of the uniformity of the U308 values in the deposit. This would eliminate considerable overhead accounting expense.
In our original analysis on the cost of refining the eight (8) percent uranium product to a yellow cake of *474 acceptable grade it was estimated that this could be done in a custom mill using either ion exchange or a solvent extraction for approximately $1.25 per pound of U308 contained in the product with a 99 percent recovery. Quotations recently received from Dawn Mining Company and Vitro Uranium Company indicated, however, that this proposed custom price cannot be obtained. The added U3Og to be treated at Dawn represented an increase in the capital investment of this plant, and the cost of transportation and losses when shipped to Vitro increased the price of the product to such a degree that it would be more economical for Northwest to consider other methods of producing a final product.
By the addition of a continuous ion exchange unit and simplified precipitation procedure it is anticipated that Northwest Uranium could produce a 70% u3Oa product for the $1.25 per pound of contained U3Og including capital repayment. As an alternative, however, it should be possible to increase the grade of the precipitate to approximately 15% by the use of ammonia instead of lime, and this product could be blended with other concentrates at the Atomic Energy Commission receiving depot and shipped direct to a feed materials plant such as Femald or Mallinckrodt.
Mr. B. B. Porter has completed the cost analysis and metallurgical report on the upgrading process through the production of the 8% product. We would like to discuss all phases of this proposal at your earliest convenience at which time we will submit Mr. Porter’s analysis.
We enclose for your information letters from Dawn Mining Company and Vitro Uranium Company indicating their proposals for the cost of upgrading the 8% product. These costs do not include freight and handling charges from the Northwest concentrator to the mills.
The attached letters from Dawn and Vitro to Northwest quoted the respective prices and terms of the mills for processing of the slurry,, and indicated that changes would have to be negotiated between the AEC and the mill operators in the terms of pertinent mill contracts.
56. Mr. Porter had prepared detailed information, tests, flowsheets, estimates and other back-up detail for the proposed concentrator for producing the slurry. This back-up material was not submitted with the July 13 letter, however, *475 but was subsequently submitted, as noted in succeeding findings, with the Northwest’s submission of October 9, 1957.
Mr. Porter, who prepared the technical detail, in testifying with respect to the July 13,1957, letter, stated that, in order to get some basis for negotiating a contract for “treatment of this ore”, he considered it necessary that they send a letter to the AEC briefly outlining the development and cost of the 8 percent slurry. He stated that he and Mr. Wilson prepared the letter together. He further testified that the basic purpose of the letter of July 13 was to submit a suggestion to the AEC that Northwest would like to start negotiations for a contract with respect to an upgraded product.
57. On July 23, 1957, Mr. Wilson telephoned Mr. Jones and inquired as to what AEC action had been taken on Northwest’s July 13 submission, and Mr. Jones replied that he had not had time to study it, and that Grand Junction' was not prepared to discuss the matter.
58. In connection with a trip to Washington, D.C., on other business in late July 1957, Mr. Wilson of Northwest met with Mr. Johnson, AEC’s Director of Eaw Materials. The Grand Junction Manager, Mr. Jones, was in Washington at the time on other matters, and attended the meeting.
Mr. Johnson discussed the general uranium supply situation and told Mr. Wilson that the supply was increasing as compared to the previous 2 or 3 years. Mr. Wilson “quizzed” Mr. Johnson about the Northwest submission of July 13, 1957, and Mr. Johnson replied that the AEC was not prepared to discuss the matter at that time.
59. On August 6, 1957, Mr. Wilson telephoned Mr. Jones at Grand Junction, and they discussed the Yitro quotation for processing of Northwest’s proposed slurry. Mr. Jones requested Mr. Wilson to discuss the matter further with Yitro.
On August 19,1957, Mr. Wilson tried to reach Mr. Jones by telephone, but was told that Mr. Jones was on vacation, but could be contacted at the American Mining Congress meeting in Salt Lake City in September.
Mr. Wilson nest saw Mr. Jones at Moab, Utah, on September 14,1957, and requested a conference, which was arranged for a later date.
*476 60. On September 23, 1957, the date appointed for the meeting, Mr. Wilson, Mr. Porter, and Dr. Scott of Northwest met at Grand Junction with the Grand Junction manager, Mr. Jones. Also in attendance was a Mr. Arentz who attended with Northwest’s representatives.
Mr. Jones advised that Grand Junction had not considered the July 13,1957, submission of Northwest, and that the AEC was having problems concerning change of policy due to increased supply of uranium ore reserves. Mr. Wilson discussed Northwest’s contacts with Vitro and Dawn concerning processing of the proposed slurry product, and advised that the quotations of both mills would require a concentrate price much higher than that which would result if Northwest operated its own uranium mill.
Mr. Jones remarked that Northwest’s proposed price of $10.46 per pound for yellow cake was one of the most reasonable prices ever presented, but that AEC was looking to the guaranteed price of $8.00 per pound for uranium concentrate.
Mr. Porter then advised that the concentrator plant, proposed by Northwest in its July 13,1957, submission, could be converted into a uranium concentrate mill by addition of an ion exchange unit, and that he had pretty well laid out the whole design for such a complete mill.
There were discussions about the financing of such a mill, in which Mr. Arentz participated, but there was no definitive presentation or showing that Northwest had or could arrange for the financing to construct the mill.
Dr. Scott’s version of Mr. Jones’ remarks about increased supply of uranium ores and the prospective price of $8.00 per pound for uranium was that Northwest was getting the “brushoff” and that AEC had all the uranium it wanted.
Mr. Jones, however, suggested that Northwest submit its proposal concerning a uranium concentrate and mill contract, including an analysis of all costs, and that such would be reviewed and considered.
61. Under date of October 9,1957, Northwest made its submission discussed in the meeting of September 23, 1957, to the Grand Junction manager. The covering letter, written by Mr. Wilson (countersigned by Mr. Porter) for Northwest to Mr. Jones stated as follows:
*477 As a supplement to our letter of July 13,1957, and our conversation of September 23rd, we are pleased to submit the metallurgical test results, the capital cost estimate, and the operating cost estimate for the production of a low grade U308 concentrate which could be produced by an upgrading unit located on the Spokane Indian Reservation, to treat the ore body of Northwest Uranium Mines, Inc. These estimates are the supporting figures for the costs as given in our letter of July 13th.
It was your suggestion that in addition to these figures we submit a rough estimate of the increased capital cost and operating cost which would be incurred should the flow plan be changed to include the production of a high grade product. This would be done by a continuous ion exchange process. This unit should give lower costs per pound of UsOs produced than any process now used, and can be broken down as follows:

Operating Costs

1) Supplies:
The leaching and neutralization reagents as given in the milling cost breakdown would remain unchanged as the same amount of acid, lime and flocculating agents would be required to leach the ore, to produce the clear solution, and to neutralize the barren solution as are required for the production of the low grade product. Thus, the added cost of chemicals for the production of the yellow cake is as listed below:
Loading — 3.0 lbs. TLOs per cu. ft.
Production 800 lbs. UaOg per day.
Resin to be loaded per day — 275 ft.
Nitrate losses @ 5.1 lbs./cu. ft_= 1400 lbs. 100% NO3
Nitrate recovery @ 65%_= 900 lbs. 100% NQ3
Net nitrate loss_= 500 lbs. 100% NOa
H2SOi for nitrate recovery_= 1500 lbs.
CaO for acid neutralization_= 900 lbs.
NaOH for U3Os precipitation_= 200 lbs.
Reagent cost:
NO3 @ 5fi per lb_=$25. 00
H2SO4 @ $28.00 per ton_= 21. 00
CaO @ 1J40 per lb_= 13. 50
NaOH @ 50 per lb_= 10. 00
$69. 50= 8. 30 per lb.
Resin life 600 cu. ft. @ $42.00 @ 2 years_= 4. 50 per lb.
Separan for settlement of precipitates_= 1. 00 per lb.
Drums, freight & insurance for shipment of yellow eake_= 4. 00 per lb.
Fuel for dryer and filter cloths_= 1. 00 per lb.
Total Supplies_= 18. 80 per lb.
*478 2) Labor:
The additional labor required over and above that given would be one ion exchange operator plus one reagent handling man per shift. One additional assayer would be required.
Thus, the total additional labor would be:
Operator and helper 3 shifts
@ $20.00/shift_=$3, 600. 00
1 assayer @ $600.00_= 500. 00
$4, 100. 00
Payroll overhead @ 16 % of
above_= 640. 00
Total labor cost per
month_=$4, 740. 00
Cost per lb. of UaOs-- = 19. 70 per lb.
3) Maintenance of equipment @ 6 % of capital cost per year_= 18, 000. 00/year 6. 20 per lb.
Total cost per lb_44. 70 per lb.
The capital cost of the additional facility has not been exactly priced as equipment quotations have not been received, but most items of the equipment used for the production of the low grade would be utilized for the precipitation of U308 except that they would be reduced in size. Thus, the additional cost would be incurred in the ion exchange unit, reagent handling, elutriation tanhs, and resin. Some addition to the building would also be required. The ion exchange unit is very roughly estimated at an increased installed cost of $300,000.00. This figure, while not precise, is of the right order of magnitude, when compared with installation costs on other jobs. This increase in the capital cost would increase the price of yellow cake by $300,000/1,200,000=250 per lb. of yellow cake. Interest and return on the investment of this additional capital should be of the order of 200 per lb. of U308 or 400 per ton of ore treated.
The total cost of yellow cake would thus be:

*479 We consider these figures to be very realistic on what might be accomplished in the milling of low grade ores at relatively low tonnages, and you will note that we have estimated a direct operating milling cost for the production of yellow cake of $7.17 per ton of ore treated. This figure compares very closely with actual costs at operations treating four times the tonnage at similar grade.
In view of all these factors we trust you will give our proposal your favorable consideration.
The attached equipment flowsheet, consisting of eight pages, showed in diagrammatic form the proposed progression of uranium ore and other necessary materials through the various sections of the proposed plant, i.e., grinding, leaching and de-watering, precipitation, reagent handling, and product handling and lime cake sections.
Also attached was a two-page summary sheet of estimated capital costs, covering milling equipment, mill buildings, outside facilities, and miscellaneous items, showing total capital requirements to be $2,223,000; a 28-page schedule of estimated equipment cost, itemizing numerous items and setting forth the cost for each f.o.b. Spokane; a 3-page schedule listing various items of equipment and the installed horsepower of each; a summary sheet of operating costs; a breakdown of personnel and salaries of supervisory staff of plant; a table of the various types of labor required and estimates of wage costs; a table of operation costs and costs of supplies ; a schedule of payroll overhead; and a schedule of insurance costs and taxes.
Also attached was a 21-page discourse concerning metallurgical tests conducted on samples of Northwest uranium ores, upgrading by mechanical means, mechanical handling of the ore, precipitation procedure, counter flow leach test, counter flow and leaching tests, oxide liquor precipitation, and precipitation tests.
62. By letter dated October 22, 1957, the Grand Junction manager advised Mr. Wilson of Northwest as follows:
This will acknowledge receipt of your letter of October 9, 1957, which supplements your letter of July 13, 1957, and submits the results of metallurgical test work, the capital cost estimate, and the operating cost estimate for the production of a low grade uranium concentrate *480 which could be produced by an. upgrading unit located on the Spokane Indian Reservation to treat the ore body of the Northwest Uranium Mines, Inc. We also appreciate having your rough estimate of the increased capital cost and operating cost which would be incurred should the flow plan be changed to include production of a high grade uranium concentrate.
The Commission is presently making a review of the Government’s requirements for future purchases of uranium concentrates. When this review has been completed, we will be in a better position to evaluate your proposed plan of operation and whether production of concentrate from this source would be consistent with future procurement requirements.
We regret the delay in advising you concerning your planned operation, but will give your proposal every consideration.
63. The evidence establishes clearly that the submission by Northwest on October 9, 1957, was one that would have required extensive investigation and consideration by the staff of Grand Junction and several months of negotiation at the Grand Junction level before the terms and conditions of a uranium concentrate or mill contract could have been reached between the AEG and Northwest, if at all.
Because of the policy statement contained in the speech of Mr. Johnson of October 28,1957, above-quoted in finding 26, no such consideration of Northwest’s submission was ever given by AEG, nor were there any negotiations conducted between Northwest and AEO toward accomplishing a uranium concentrate or mil] contract. This was consistent with the AEO’s announced intention in the October 28 notice that pre-October 28 proposals would be considered “in the light of the discussions which have taken place.” The record shows that in the discussions which had taken place, Northwest’s officials had been advised of the AEG’s concern over the need for continuance of the existing uranium program.
64. Northwest mined no portion of its ore deposit. It did not procure a source material license, a prerequisite for ore delivery. It neither delivered nor tendered for delivery any uranium-bearing ores to the AEG at its Monticello, Utah, buying depot or at any other location. The Dawn mill, to which its deposit was tributary, was completed and in *481 operation in July-August 1957, and provided a market for Northwest’s ores in the immediate vicinity of its deposit. Because plaintiff realized it had no formal contract, it did not take action to place itself in a position to mine, produce, or deliver any uranium-bearing ores, it did not obtain the initial production bonus on the first 10,000 pounds of Us08 in ores from a producing mine which it could have obtained under Circular 6.
¡65- Northwest was voluntarily liquidated at the instance of the shareholders, or controlling shareholders, in May 1958, assertedly for the reason that its assets were insufficient to enable it to engage in the profitable exploitation of the leased property by the mining and milling of ores. Mr. Gay, the treasurer of Northwest, was appointed as trustee and is party-plaintiff in that capacity.
Concurrently with the liquidation and as a paif of the same transaction, Northwest sold, transferred, and assigned all its right, title and interest in and to the leased properties on which these deposits were located, and other assets, to the Silver Buckle Mining Company, under contract dated March 15,1958, effective May 10,1958, for a stated consideration of $2,500,000, and a division of the net profits realized by Silver Buckle from the exploitation of the uranium ores present in or upon these properties.
Mr. Gay thereupon discontinued as treasurer of Silver Buckle and became its salaried office manager as well as trustee for Northwest’s shareholders. His stock interest in the two companies remained unchanged. The positions and interests, direct and indirect, of the other two principals, Dr. Scott and Mr. Wilson, in Northwest and Silver Buckle continued as set forth in preceding findings.
66. Following transfer of the lease interests to Silver Buckle from Northwest, and on May 15,1958, Silver Buckle applied for and obtained a source material license. Stripping and other preparatory mining activities were thereafter undertaken. In June 1958, Silver Buckle and Dawn entered into an ore procurement agreement providing for purchase by Dawn from Silver Buckle of a minimum of 60 tons of ore per day for a 1-year term commencing on July 1, 1958.
*482 The contract between Silver Buckle and Dawn required that the Silver Buckle ores delivered for processing at Dawn mill have an average grade of not less than .20 percent T7308, later reduced to .19 percent. This necessitated expensive selective strip mining of the Silver Buckle ore deposits, stockpiling for possible future use of large quantities of low-grade ores, and use of mechanical upgrading equipment on the selected ores processed and delivered to the Dawn mill.
67. Silver Buckle did not complete preparatory activities until late August, however, and the first ore from the property (Peters Lease) was then produced. Thereafter, Silver Buckle made application for certification of the Peters Lease for the initial production bonus under Circular 6, and through production and delivery of the requisite quantities of ore assaying .20 per cent U308 or higher, obtained bonus payments in the maximum amount provided in the Circular, i.e., $35,000.
68. From the inception of production until disposition of the property by Silver Buckle in March 1960, the ores produced were sold by Silver Buckle to Dawn under and in accordance with agreements between the parties, from which Silver Buckle realized the sum of approximately $821,000, including the initial production bonus paid by the AEC pursuant to the application filed by Silver Buckle. Silver Buckle incurred a net loss in this venture, however, because of the high costs of mining as a custom producer.
.69. When Silver Buckle acquired the Northwest leases and commenced the first mining operations on the Peters claim, it had full knowledge (a) that the AEC on October 28, 1957, had publicly announced the prospective limitation of future concentrate purchase commitments; (b) that with specific reference to the Spokane area, the AEC had reached a determination that existing milling facilities at Dawn provided an adequate and reasonable market for the ore producers of that area, and that no further concentrate proposals for that area would be entertained; and (c) that the AEC had refused to entertain numerous requests made by Northwest after October 1957, concerning special concessions or milling arrangements at the Dawn mill which would have enabled Northwest to market large tonnages of low-grade *483 ores and thereby dispose of all of its ore reserves on or before March 31,1962.
70. On or about March 1,1960, Silver BueHe sold, transferred, and assigned its light, title, and interest in and to the leases and mineral rights to Dawn Mining Company for the sum of approximately $1,000,000.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petition is, therefore, dismissed.

 The style of this case is “Jack D. Gay, Trustee for Shareholders of Northwest uranium Mines, Inc., a corporation in liquidation, Northwest Uranium Mines, Inc., a corporation in liquidation, Silver Buckle Mining Company, a corporation, [and] Idaho First National Bank Building, Wallace, Idaho, Plaintiffs.” Northwest Uranium Mines, Inc. (Northwest) and Silver Buckle Mining Company (Silver Buckle) are Idaho corporations, each having its principal place of business in wallace, Idaho. On May 10, 1958, the shareholders of Northwest voted to liquidate, and Jack D. Gay was appointed by the District Court of the State of Idaho to serve as trustee for the shareholders. Although the present claim is based on the activities of Northwest, Silver Buckle is an interested party because it acquired certain leases from Northwest and took over the operation of the ore body, promising to divide any profits in agreed proportions.

 Circular No. 5, Revised, provides in pertinent part:
“§ 60.5 Guaranteed minimum price for uranium-hearing carnotite-type or roseoelite-type ores of the Colorado Plateau area — (a) Guarantee. To stimulate domestic production of uranium-bearing ores of the Colorado Plateau area, commonly known as carnotite-type or roscoelite-type ores, and in the interest of the common defense and security, the united States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in § 60.5a effective during the period, March 1, 1951, through March 31, 1962, for the delivery of such ores to the Commission at Monticello, Utah, in accordance with the terms of this section and § 60.5a.
* * * * *
“(d) Deliveries of not to emceed 1,000 tons per year. To aid small producers, any one seller may deliver without a written contract but otherwise in accordance with this section up to, but not exceeding, 1,000 short tons (2,000 pounds per ton) of ores during any calendar year.
“(e) Deliveries in excess of 1,000 tons per year. Sellers desiring to deliver in excess of 1,000 short tons (2,000 pounds per ton) of ores during any calendar year will be required to enter into a contract with the Commission providing for, among other things, a rate of delivery and- the total quantity of ore to be delivered.
“(f) Delivery. Seller, at his own expense, shall deliver and unload all ores at the buyer’s depot at Monticello, Utah. Deliveries! shall be in lots of not less than 10 short tons (2,000 pounds per ton) unless special arrangements have been agreed upon by buyer, but such lots may be delivered in more than one load. Days and hours during which ore may be delivered will be posted at the depot.
*****
“ (k) Limitation of commitment. Commitments by the Commission to accept delivery of ores are limited to the provisions of this section and § 60.5a as amended from time to time, or to written contracts between the Commission and sellers. Other commitments purporting to be made by the Commission’s field personnel or other agents of the Commission will not bind the Commission unless they are in accord with the provisions of this section and § 60.5a or other official circulars.
“§ 60.5a. Schedule I: minimum prices, specifications, and conditions— (a) Prices. Payment for delivery of the ores will be computed on the following basis:
“(1) Uranium, (i) Ores assaying less than 0.10 percent: no payment. Any such ores which are delivered to the purchase depot shall, unless otherwise specifically agreed to by buyer, become the property of the buyer as liquidated damages for buyer’s expense of weighing, sampling, and assaying, and after sampling may be placed in process, commingled, or otherwise disposed of by buyer. If seller has any question as to the quality of his ore, it is suggested that before shipment and delivery to the purchase depot a representative sample be submitted to the buyer or to one of the umpires for assay at seller’s expense. The buyer at its discretion may assay a limited number of samples without charge.
“(ii) Ores assaying O.liO percent U308 and more, as follows:

*424

“(iii) Premiums on uranium: $0.75 per pound for each pound of ü308 in excess of 4 pounds U3Os per short ton (2,000 pounds per ton) of ore and an additional premium of $0.25 per pound for each pound in excess of ten pounds u3Os per short ton. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.
“(3) Allowances, (i) A development allowance of $0.50 per pound U3Os in ores assaying 0.10 percent U308 or more in recognition of expenditures incurred or likely to be incurred in the development or exploration necessary for maintaining and increasing developed reserves of uranium ores. Fractional parts of a pound will be paid for on a pro rata basis to the nearest cent.
“(ii) A haulage allowance of 6 cents per ton mile for transportation of ore paid for under § 60.5 and this section from the mine were produced to the purchase depot specified by the Commission, up to a maximum of 100 miles. The haulage distance from the mine to the purchase depot will be determined by the Commission and its decision will be final. Tonnages for purposes of this allowance shall be calculated on the basis of natural weights rather than dry weights.
>Jc * * sft *
“(b) Quality and size. Ores will not be accepted by buyer under §§ 60.5 and 60.5a which, in buyer’s judgment:
“(1) Contain less than 0.10 percent U808;
* # * * *
“(3) Contain impurities deleterious to buyer’s extraction process or for any other reason are not amenable to it;
* * * * #
“NOTE: The Commission will be interested in discussing arrangements for delivery to it of types of uranium-bearing materials other than those for which guaranteed prices have been established, such as tailings, mill products, and ores of types not acceptable under §§ 60.5 and 60.5a.”

 The May 24, 1956 announcement provided as follows:
“The U.S. Atomic Energy Commission today announced establishment of a new domestic uranium procurement program for the period from April 1, 1962 through December 31, 1966, and an extension of the initial production bonus for uranium ore from February 28, 1957, its present expiration date, through March 31, 1960.
“The new domestic procurement program provides a guaranteed market for all uranium concentrates produced by domestic mills from domestic ores, subject to a limitation, at the Commission’s option, of 500 tons of u308 per year from any one mining property or mining operation and to compliance with *425 Commission specifications. The price established is $8.00 per pound of U3Oa contained in normal mill concentrates or precipitates.
“This action was taken in recognition of the need for a continuing Government market in order to maintain a high rate of exploration and development. Although domestic uranium production has shown a remarkable expansion, known ore reserves will be greatly depleted by 1962 unless extended by aggressive development and exploration. A high rate of discovery is essential if substantial production is to be maintained after that date. The new domestic uranium procurement program provides assurance of a government market for an additional period of almost five years beyond March 81, 1962. This assurance will assist uranium mining and milling firms in planning future operations.
“The present uranium ore procurement program will remain in effect until March 31, 1962. The new program establishes a base price for domestic uranium concentrates, rather than ores, for the period from April 1, 1962, through December 31, 1966. The base price will be $8.09 per pound of ü3Os contained in concentrates meeting specifications. This price will be applicable to the type of concentrate, i.e., high grade chemical precipitates, which is being purchased presently under negotiated unit price contracts with milling companies.
“The $8.00 price was determined on the basis of a study of existing contracts, known sources of supply and estimated costs of production.
“uranium concentrate producers desiring to sell to the Commission will be required to enter into contracts specifying the period of delivery, the quantity to be delivered, the rate of delivery, the place of delivery, the type of packaging and other standard provisions of commercial-type contracts. The contracts may cover the period April 1, 1962, through December 31, 1966, or a shorter period. The Commission, at its option, may limit the purchase of concentrates derived from any one mining property or mining operation to 500 tons of us03 per year. Depending upon requirements additional quantities may be purchased. Such purchases of additional quantities may be at prices lower than $8.00.
* * * 5¡t ‡
“Pertinent details of the new program will be published at a later date.”

 See n. 1, supra.

 Rlaintiffs ash for no remedy other than lost profits. Section 90 of the No. 2 Tentative Draft of the Restatement of Contracts (April 30, 1966.) has added the following sentence: “The remedy granted for breach may be limited as justice requires.” The Reporter comments: “The principal change from the original Restatement is the recognition of the possibility of partial enforcement.” Tent. Draft No. 2, p. 173. Since plaintiffs have a more appealing claim for damages covering provable reliance, we have reviewed the facts in the light of the trend shown in the Restatement.

Wormser, The True Conception of Unilateral Contracts, 26 Yale L.J. 136-139 (1916).

In estimating the mineable reserves contained in an ore body, it is necessary to determine the minimum grade ore that can be economically or profitably mined and milled. Such a minimum grade below which reserves are not computed for economic reasons Is referred to as the “cutoff point.” As applied to Northwest, it was determined by Mr. Porter, after running extensive tests on ore samples, that the economical cutoff point would be .06 percent uaOs. It should be noted that although Circular No. 6 provides a payment schedule for ores commencing at .10 percent ü3Os, in practice it was immaterial to the AEC whether the ores directly met the requirement or whether they were blended.